CHICAGO, ST. P., M. & O. RY. CO. et al. v. UNITED STATES.*

(Circuit Court of Appeals, Eighth Circuit. May 25, 1908.)

No. 2,701.

1. CARRIERS—INTERSTATE COMMERCE—INDICTMENT FOR GRANTING REBATES.

An indictment against a railroad company for granting rebates in violation of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907. p. 880), need not set out a particular description of the device resorted to, but is sufficient where it avers the kind of property shipped. the time and place when and where shipped, the consignee, the existing legal tariff for such shipment, the payment thereof by the shipper, the subsequent payment of the rebate by the carrier to the shipper, and the time and amount of such payment.

2. SAME—ELEMENTS OF OFFENSE—REFUNDING OF ELEVATOR CHARGES.

A railroad company whose published schedule rate for the carriage of oats in interstate shipment from Minneapolis to Duluth or Superior was five cents per 100 pounds, and which received payment from a shipper at such rate, but, on shipments intended for through transportation over the lakes, later refunded to the shipper the elevator charges for transferring the grain from its cars to vessels after the termination of its own carriage amounting to one-half cent per bushel, was guilty of granting a rebate or concession from the published schedule rate, in violation of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), and it was no defense to a prosecution therefor that competing roads granted a like concession, and that it was compelled to do the same in order to secure its fair share of the business, or that it treated all shippers alike, or that the concession was made by its officers in good faith and in the honest belief that it was lawful.

3. SAME—CONSTRUCTION OF STATUTE—"WILLFUL" GRANTING OF REBATES.

The use of the word "willful" in Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), to characterize offenses thereunder, conceding it to apply to the granting of rebates from the published schedule rates, does not require that there should have been an evil intent to constitute the offense, but it is sufficient if the act was done knowingly and purposely.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 8, pp. 7468–7481, 7835–7836.]

In Error to the District Court of the United States for the District of Minnesota.

For opinion below, see 151 Fed. 84.

Thomas Wilson, for plaintiffs in error.

Charles. C. Houpt (Paul A. Ewert, on the brief), for the United States.

Before SANBORN and ADAMS, Circuit Judges, and PHILIPS, District Judge.

ADAMS, Circuit Judge. The Chicago, St. Paul, Minneapolis & Omaha Railway Company, a common carrier of interstate commerce, and H. M. Pearce, its general freight agent, were found guilty in the court below of granting rebates to the Spencer Grain Company, a corporation doing business in Minneapolis, Minn., in violation of Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), known as the "Elkins Act." They were indicted in 50 separate counts for granting that number of rebates from the rate named

*Rehearing denied Sept. 14, 1908.

in the tariffs and schedules of rates then published and filed by the carrier with the Interstate Commerce Commission for carrying oats from Minneapolis to Duluth, Minn., over a route which passed through some portion of the state of Wisconsin. They were found guilty on all counts, and one fine of $20,000 and $2,000 was imposed upon the two named defendants, respectively, for punishment. This writ of error is prosecuted to secure a reversal of that judgment.

Only one out of 50 counts of the indictment appears in the record, and, as this is conceded to be fairly representative of them all, we here reproduce it. After alleging that the defendant railway company was a corporation and common carrier of interstate commerce between Minneapolis through the city of Superior, in the state of Wisconsin, to the city of Duluth, in the state of Minnesota, and that defendant Pearce was the general freight agent of the railway company, it proceeds as follows:

"That on the 26th day of December, 1905, the said Spencer Grain Company did deliver certain property, to wit, one (1) carload of oats * * * consigned to Cargill Commission Company, Duluth, Minn., to the said common carrier aforesaid, at the said city of Minneapolis, for transportation by the said common carrier, the Chicago, St. Paul, Minneapolis & Omaha Railway Company, by interstate commerce to the said city of Duluth before mentioned, and the said common carrier did immediately, upon and in pursuance of such delivery of said property, so transport the same by interstate commerce over its said route or line of railway hereinbefore mentioned, running from the said city of Minneapolis to the said city of Duluth, * * * upon which said property and for the transportation thereof, as aforesaid, the said Spencer Grain Company did thereupon pay to the said common carrier, and the said common carrier did receive from said Spencer Grain Company, the freight rates and charges for the transportation of said property set forth in the tariffs and schedules then showing the legal rates and charges established by said common carrier for such services, then in force and effect upon its said route, to wit, five cents (5c) for each one hundred pounds (100 lb) thereof, copies of which tariffs and schedules * * * had theretofore been, by said common carrier aforesaid, published as required by law, and by it filed with the Interstate Commerce Commission of the United States, as required by law. * * * That the said [defendants] did on the 15th day of February, A. D. 1906, at the said city of Minneapolis * * * 'willfully and unlawfully grant and pay to the said Spencer Grain Company' * * * certain rebates of the said freight rates and charges so paid as aforesaid, and certain concessions in respect to the said transportation of said property, whereby the said property was by the said corporation and common carrier transported in said interstate commerce from the said city of Minneapolis to the said city of Duluth, by the route and in the manner aforesaid, at a less compensation and rate than that named therefor in the said tariffs and schedules; that is to say, a rebate, refund, and concession of one-half cent (½c) per bushel on each bushel of said oats * * * so as last aforesaid mentioned, delivered and transported. * * *"

Before entering upon a consideration of the assignment of errors, we will briefly state certain uncontradicted facts. Before 1903 the railway company had undertaken to transport grain from Minneapolis to Buffalo on through bills of lading issued by it. In such cases it had carried it from Minneapolis to Superior or Duluth over its own road, and there delivered it to vessels to be carried by them over the lakes to Buffalo, making its own contracts with the navigation companies and paying them for their service. Finding this arrangement unsatisfactory, shipments of grain for over the lakes were made by the

railway company over its own line only, to specified consignees at Duluth or Superior, with a memorandum in the shipping bill that they were for over the lakes to Buffalo. It was found by the railway company to be impossible to get any of this business for carriage over its line to the incipiency of the lake transportation without absorbing the charge for elevator service in removing the grain from the cars after their arrival at the end of its road to the vessels, because of the fact that other lines in natural competition with it for that business were so absorbing that charge. Accordingly the general freight agent gave directions for the solicitation of freight destined for Buffalo on the terms that the elevation charges at Duluth or Superior, as the case might be, would be assumed and paid by the railway company. Pursuant to such directions, and for the purpose of getting its share of the over the lakes business, the railway company accepted the grain specified in the indictment and all other grain offered to it at Minneapolis destined for Buffalo from Spencer Grain Company, or any other shipper at Minneapolis for carriage over its own line to the consignee thereof at Duluth or Superior, with an understanding and agreement that it would pay the elevation charge at the end of its route. Before the dates of the respective shipments mentioned in the several counts of the indictment, the railway company had published and filed with the Interstate Commerce Commission, as required by law, schedules showing the rates and charges for the transportation of grain like that mentioned in the indictment over its line from Minneapolis to Duluth or Superior to be five cents for each 100 pounds, and had never published or filed any schedule showing that it absorbed the elevation charges on over the lakes business. This schedule rate and charge remained unchanged until after the transactions involved in this indictment. The legal rate of five cents per 100 pounds was in each of the instances specified in the indictment first paid by or for the Spencer Grain Company, the shipper, to the railway company, and afterwards the shipper made a claim against the railway company for the elevation charge, which amounted to one-half of a cent per bushel, which it had paid, and this was repaid to it by the railway company. The evidence discloses that all shippers of grain from Minneapolis over the railway company's line destined for Buffalo over the lakes were treated alike; that no discrimination between shippers in that line of business was intended or practiced; and that any officer or agent of the railway company representing or acting for it in the matter of making or executing this agreement with the Spencer Grain Company did so in good faith, believing it to be legal and proper.

· There are a large number of errors assigned, but most of them fall within two main propositions advanced in brief and argument: (1) That the indictment is insufficient in law; and (2) that the proof is insufficient to establish guilt.

Is the indictment good? It is first challenged by general demurrer and afterwards by objection to evidence on the ground that it failed to state an offense. This last-mentioned method of questioning the sufficiency of an indictment has heretofore met with our disapproval (Morris v. United States [C. C. A.] 161 Fed. 672, recently decided by us); but this is unimportant, inasmuch as the demurrer

seasonably and effectually questioned it. The test of a good indictment, as frequently declared by this court and by the Supreme Court, is whether all the essential elements of the offense are stated with sufficient clearness and certainty to inform the court of the facts charged, so that it may decide as to their sufficiency in law to support a conviction, to enable the accused to understand the nature of the accusation against him, to intelligently prepare to meet it, and to plead the judgment rendered thereon, whether of conviction or acquittal, as his protection against another prosecution for the same offense. The indictment sought to charge the offense denounced by the first section of the Elkins act (32 Stat. 847), which, when read in connection with Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), and its amendments, enacts in effect that every person or corporation engaged in the business of interstate transportation who shall offer, grant, or give any rebate or concession in respect to the transportation of any property in interstate commerce whereby such property shall by any device be transported at a less rate than that named in the tariffs, published and filed by such carrier with the Interstate Commerce Commission, shall be deemed guilty of a misdemeanor. The substantial elements of the offense are few. There must be (1) the granting or giving of a rebate (2) from the published and filed rates (3) for the transportation of property (4) by a carrier engaged in interstate commerce. The indictment in our opinion contains all these elements, and they are specified with all the detail and certainty required by the rule just referred to. There is no particular description of the device resorted to by the defendants to accomplish the unlawful transportation, but this is not necessary. Armour Packing Co. v. United States, 153 Fed. 1, 82 C. C. A. 135. There are found in the indictment clear and definite allegations showing the kind of property shipped, the time and place when shipped, the consignee to whom shipped, the existing legal tariff or rate for such shipment, the payment thereof by the shipper to the carrier, the subsequent payment of the rebate or concession by the carrier to the shipper, the time when it was paid, and the amount thereof. These details afforded all the required certainty and the indictment was clearly sufficient. Thomas v. United States, 156 Fed. 897, 84 C. C. A. 477.

The indictment before us and before the Supreme Court in the Armour Packing Company Case, which was for the offense of receiving a rebate, in violation of the same statute we are now considering, disclosed no greater certainty or particularity of statement than this one, and it was held sufficient by both courts. We see no reason to depart from that holding.

As defendant Pearce, according to stipulation of the parties and the undisputed evidence, was the active agent of the defendant railway company in all the acts and transactions involved in this case, and as the legal consequences of such acts and transactions involve him in like manner as they do the railway company, we shall not, as we proceed with this opinion, attempt to distinguish between them.

Was the proof sufficient to sustain the charge? The main features of the case which in the opinion of learned counsel for defendants

require a negative answer to this question will, we think, not sustain them in their contention. There is evidence tending to show that the sole purpose and object of absorbing the cost of elevation by the railway company was to enable it to get its fair share of the initial transportation of grain destined for Lake Erie ports; that it was no part of the railway company's duty under its contract with the shipper to pay the cost of elevation, and that its duty was done and its transportation ended when the cars containing the grain were delivered at the elevator where it could be safely and conveniently reloaded into vessels; that other lines competing with the railway company for the same business absorbed the elevation charge just as the railway company did and that it treated all alike. Let these facts be conceded and the important fact remains incontrovertible that the railway company actually received as a net result less than 5 cents per 100 pounds for all the service it could or did render the shipper, namely, for the transportation of the grain in question from Minneapolis to the end of its road at Duluth, at a time when the legal tariff and rate was five cents per 100 pounds. By so doing did it not, in some way, make a concession to the shipper "whereby the property was transported at a less rate than that named in the tariffs scheduled," etc.? In our opinion the fact that other railroads competing for the over the lakes business absorbed the elevation charge, and that it was necessary for the defendant company to do so to secure participation in that business, cannot alter the legal effect of what was done. We suppose the main reason which in times past moved railroad companies to makes rebates or concessions in individual cases was to secure business for their lines, and that the spirit of competition in the race for business brought about the practice of so granting rebates and concessions. This practice, we understand, was the vice aimed at in recent legislation which has for its main object the equalization of rates between given points for the same service. We are unable to see how the fact that no duty was imposed upon the railway company under its contract with the shipper to pay elevation charges incident to transferring the grain from its car to the vessels on the lake can be of any avail to the defendants in this case. The contrary seems true to us. The fact that no such duty rested on the railway company seems to us to make against rather than in favor of defendants' contentions. If the railway company had no duty in that particular, inasmuch as the elevation service was a necessary part of the through transportation, the act done by it was a voluntary contribution of something of value to the shipper which in fact reduced his outlay for transportation over the defendants' line and thereby facilitated the defendants in the accomplishment of their avowed object to secure a reasonable share of that trade. The fact that defendant railway company treated all shippers of the same class of property for the same destination alike might be important and conclusive on a charge of discrimination; but, when the charge involved is granting a rebate or concession from a fixed tariff or rate in violation of a statute in clear terms making that particular act an offense, we are unable to appreciate the pertinency of evidence disclosing no violation of another and different provision of the interstate commerce law.

Witnesses produced by defendants testified that the payment of the elevation charge by the railway company had nothing to do with the established tariffs and rates between Minneapolis and Duluth, and was not intended by the parties to constitute a rebate or concession from the legal rates of freight. We think this evidence was incompetent and immaterial. It amounted to nothing more than the opinion of witnesses concerning the law of the case or the legal effect of the facts proved. Every one is presumed to intend the natural consequences of his acts, and, if their legal effect amounts to the grant of a rebate or concession from the fixed rate, it makes little difference what the opinions of witnesses concerning it may be.

The learned trial judge advised the jury that "the law requires the carrier to adhere to the published rate as an absolute standard of uniformity"; that the provision requiring publication of the schedule of rates was made "in order that the man having freight to ship may ascertain by an inspection of the schedules * * * exactly what will be the cost to him of the transportation of his property between the points named in the schedule." He also told them that the law gave the shipper the right to know, by an inspection of the schedules, exactly what the cost to his competitor was for the transportation of his property between the same points. This was a correct interpretation of the statute. Chicago & A. Ry. Co. v. United States, 156 Fed. 558, 84 C. C. A. 324. Private arrangements between a carrier and one or more shippers, not disclosed by the published and filed schedules, which have the effect to reduce rates from those so scheduled, disturb the essential standard of uniformity, and, whatever be the understanding or intent of the parties, thwart the legislative intent, and cannot be permitted. There was also much evidence tending to show, and in our opinion satisfactorily showing, that the officers of the railway company intended no wrong, but acted in the best faith, honestly believing that the absorption by them of the elevation charge in question, in order thereby to secure a share in the over the lakes business, did not constitute a rebate or prohibited concession within the meaning of the Elkins act.

This last-mentioned evidence is strongly relied upon by defendants' able counsel as a complete defense in this case. They call attention to the rulings of the Interstate Commerce Commission in the Matter of Allowances to Elevators by the Union Pacific Railroad Company, 10 Interst. Com. R. 309, and Id., 12 Interst. Com. R. 85, and to the cases of Detroit, etc., Ry. Co. v. Int. Com. Comm., 74 Fed. 803, 21 C. C. A. 103, Int. Com. Comm. v. Detroit, etc., Ry. Co., 167 U. S. 633, 644, 645, 17 Sup. Ct. 986, 42 L. Ed. 306, Wight v. United States, 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258, and Int. Com. Comm. v. Alabama Midland Ry. Co., 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414, as a justification for their honest belief that their act in absorbing the elevation charges in question constituted no offense. These cases have all been critically examined, and they are found to relate generally to the "unjust discrimination," the "long and short haul," and "schedule" clauses of sections 2, 4, and 6, respectively, of the interstate commerce act of February 4, 1887 (24 Stat. 379), and, while expressions are found in them which might well have afforded

ground for belief by defendants that their act in absorbing the elevation charge in question was justifiable and lawful, they do not purport to decide the question involved in this case. Indeed, they are not relied upon as authority for granting a rebate or concession within the contemplation of the Elkins act.

Knowledge of the rulings in these cases by defendants, together with the evidence of the witnesses on the subject of their good faith, are claimed to constitute a demonstration that no willful or evil intent, no bad faith, actuated defendants in doing what they did, but that they did what they did in the honest belief that it was lawful and permissible. It is argued that the adjective "willful" found in that part of section 1 of the Elkins act qualifying the failure "to file and publish the tariffs or rates and charges as required by said acts or strictly observe such tariffs until changed," etc., is by necessary implication and connection carried forward and made to qualify the misdemeanor afterwards denounced in the granting or giving of rebates or concessions. Assuming that such is the true meaning of the act, it is argued that no offense is made out by the proof because the essential element of willfulness—that is, the evil mind, the criminal and willful intent to do wrong—is absent. Support is found for this argument in the following authorities:

Bishop on Criminal Law, §§ 287, 288, in which it is said:

"There can be no crime, large or small, without an evil mind. In other words, punishment is a sequence of wickedness, without which it cannot be. * * * 'Actus non facit reum nisi mens sit rea.'"

Felton v. United States, 96 U. S. 699, 24 L. Ed. 875, treating of the violation of the law governing the distillation of spirits (Act July 20, 1868, c. 186, § 16, 15 Stat. 131), which required an act to be done or omitted "knowingly and willfully" to constitute an offense, in which it is said that "doing or omitting to do a thing knowingly or willfully implies not only a knowledge of the thing but a determination with a bad intent to do it or to omit doing it."

Evans v. United States, 153 U. S. 584, 594, 14 Sup. Ct. 934, 38 L. Ed. 830, where it is held that the words "willfully misapplies," found in section 5209, Rev. St. (U. S. Comp. St. 1901, p. 3497), in relation to offenses against the national banking laws, contemplates and presupposes an "evil design."

Potter v. United States, 155 U. S. 438, 446, 15 Sup. Ct. 144, 39 L. Ed. 214, construing the meaning of section 5208 of the Revised Statutes and the subsequent act of July 12, 1882 (22 Stat. 166, c. 290, § 13 [U. S. Comp. St. 1901, p. 3497]), which imposes a penalty upon any one who should willfully certify a check unless the drawer had on deposit at the time an equal amount of money, where it is held that the word "willful" as there employed implies not only a knowledge of the thing "but a determination with a bad intent to do it or to omit doing it." Spurr v. United States, 174 U. S. 728, 19 Sup. Ct. 812, 43 L. Ed. 1150, where the Chief Justice reiterated the doctrine of the Felton, Evans, and Potter Cases touching the meaning of the words "willful violation" when employed in a statute, and observed that: "The wrongful intent is the essence of the crime."

This argument, when made, impressed us strongly. It seemed contrary to natural justice and in conflict with the fundamental principle underlying the administration of criminal law as recognized by the Supreme Court in the foregoing cases to punish parties who had reason to believe and did honestly believe that what they did was lawful and right. This, however, seemed doubtful and dangerous doctrine, and commanded our most serious consideration. In most cases the evil mind or bad intent accompanies the doing of a wrongful act, and no difficulty arises in the disposition of a case involving an offense malum in se. It is only when an offense malum prohibitum is charged that the application of the general doctrine becomes doubtful. To hold that the belief of an individual concerning the legality of his action should constitute a standard of innocence or guilt would establish an uncertain and dangerous criterion. It would in many cases justify a violation of statutes expressive of public policy concerning which there may obviously be and frequently are as many different opinions as there are different individuals affected by them. In view of considerations like these, the general doctrine alluded to has been modified in its application to statutory offenses. In the Spurr Case, 174 U. S. 728, 19 Sup. Ct. 812, 43 L. Ed. 1150, the Chief Justice clearly perceived the difficulties just suggested, and, after reviewing the prior cases and restraining the general doctrine that the word "willful" when employed to express the quality of an act denounced by a statute involves an evil intent or bad purpose, said:

"If an officer certifies a check with the intent that the drawer shall obtain so much money out of the bank when he has none there, such officer not only certifies unlawfully, but the specific intent to violate the statute may be imputed. And so evil design may be presumed if the officer purposely keeps himself, in ignorance of whether the drawer has money in the bank or not, or is grossly indifferent to his duty in respect to the ascertainment of that fact."

In the Armour Packing Company Case, supra, this court, answering the contention there made that the evidence disclosed no criminal intent on the part of the shipper who was there charged with receiving a rebate in violation of the provisions of section 1 of the Elkins act, said:

"A corrupt purpose, a wicked intent to do evil, is indispensable to a conviction of a crime which is morally wrong. But no evil intent is essential to an offense which is mere malum prohibitum. A simple purpose to do the act forbidden, in violation of the statute, is the only criminal intent requisite to a conviction of a statutory offense, which is not malum in se."

The Supreme Court, answering the same contention in the same case, when there for review, said:

"It is contended by the petitioner that there is nothing in the facts found in this case to show any intentional violation of the law; that, on the contrary, the petitioner believed itself to be within its legal rights in insisting upon the performance of its contract, and maintained in good faith that the interstate commerce act did not and could not interfere with it, and that the statute had no application to a shipment of goods for exportation in the manner shown in this case. While intent is in a certain sense essential to the commission of a crime, and in some classes of cases it is necessary to show moral turpitude in order to make out a crime, there is a class of cases, within which we think the one under consideration falls, where purposely doing a thing prohibited by statute may amount to an offense, although the act does

not involve turpitude or moral wrong. In this case the statutes provide it shall be penal to receive transportation of goods at less than the published rate. * * * The stipulated facts show that the shippers had knowledge of the rates published, and shipped the goods under a contention of their legal right so to do. This was all the knowledge or guilty intent that the act required."

The defendants in this case published and filed the tariffs and schedules fixing the legal rate of freight from Minneapolis to the end of their line at Duluth at five cents per 100 pounds for the transportation of grain. These tariffs and schedules remained unchanged and in force at the time they received the grain in question for transportation. They thereafter received from the shipper the full rate of five cents per 100 pounds carried, and afterwards paid back to the shipper one-half of one cent for each bushel of grain carried; the same being the amount which the shipper had been required to pay for the elevation charge at Duluth in order to continue the transportation beyond the terminus of defendants' line to its destination. This was done pursuant to an arrangement before then made between the defendants and the Spencer Grain Company and all other shippers of grain from Minneapolis destined to ports on Lake Erie, in order to secure their share of the initial transportation of such grain. Of these facts, we understand, there is no contradiction or doubt. They disclose acts intelligently performed, by the defendants, for an avowed purpose.

The only remaining question is whether the return by the defendants to the shipper of the elevation charge required to be paid and actually paid by the shipper or his consignee for their own purposes and in no sense for account of the railway company constituted a prohibited rebate or concession within the meaning of the Elkins act. The statement of this question, in view of conclusions already reached on debated questions of law, seems to us to admit of but one rational answer. This, however, was a criminal case, and the verdict of a jury on a fair submission of the facts to them was essential to a valid judgment against the defendants.

Was the case fairly submitted to the jury? The learned trial judge, after treating exhaustively the various questions debated by counsel which have already been disposed of by us, told the jury that they must, in order to find the defendants guilty, find the facts to be true as charged in the indictment, and also advised them that they must, in order to convict, believe that the effect of what was done was to have the grain in question "transported at a less rate than that named in the tariffs and filed by the defendant company, the carrier"; that the defendants did the acts complained of "knowingly and intentionally," and knew "that they were departing from the rate, and that the effect of what they were doing was to diminish the cost of the transportation of the property by the amount of that concession, and that they intended to do so." The charge as shown in the foregoing excerpts and elsewise submitted for the determination of the jury the vital questions whether the transaction as actually conducted between the defendants and the grain company had the effect of reducing the cost of transporting the grain in question below the schedule rates, and whether the defendants intended that such effect should follow as a result of what they did. These questions presented the very

nub of the case, and their answer, in view of the other incontrovertible facts of the case, determined the guilt or innocence of the defendants. We have carefully examined the charge as a whole, and find that it submitted the important issues in the case with clearness and eminent fairness to the jury for their consideration. The verdict as rendered responded intelligently to the questions submitted was supported by substantial evidence and ought not to be disturbed.

In view of the foregoing, we find no occasion to pass categorically upon the various assignments of error as they appear in the record. Their disposition is necessarily involved in the conclusions already, reached.

The judgment must be affirmed.