## VANDALIA R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. May 20, 1915. Rehearing Denied July 28, 1915.)

No. 2164.

1. CARRIERS ⬅️⮞32—REGULATION—REBATING.

The Elkins Law (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847, as preserved by amendment by Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 [Comp. St. 1913, § 8597]), making it an offense to give a rebate whereby any property shall, by any device whatever, be transported at a less rate than that named in the tariffs, aims to prohibit, not only discrimination between shippers, but any departure from the tariff rates, irrespective of its actual discriminatory effect; and that the full tariff rate is collected does not negative the possibility of a rebate in respect thereto, either in a lump cash sum in advance, or by later or earlier indirect payments.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. ⬅️⮞32.

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Commission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

2. CARRIERS ⬅️⮞32—REBATE—LOAN.

Under such provision, a railroad whose charter did not permit it to loan money, or to buy and sell coal lands, which, through a company it organized, contracted with a coal company to loan it a large amount upon notes bearing interest at 2 per cent., and borrowed the amount on its own notes, with interest payable at 4 per cent., and to which the coal land was to be conveyed as security for the loan, and which at its own cost constructed tracks on the land and obtained the coal company's exclusive tonnage, a minimum being fixed for each year, and to which the coal company agreed to sell coal for its use at $1.20 per ton, subject to change according to the wage and mining scale, was guilty of an un-

lawful rebating, where the fact that the railroad had never had difficulty in getting coal at the market price, sometimes less than the agreed price, justified the jury in finding that such provision was a subterfuge and of no value.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. ☞32.]

3. CRIMINAL LAW ☞829—PROSECUTION FOR REBATING—REQUESTED INSTRUC-TIONS—GIVEN INSTRUCTIONS.

In a prosecution for rebating under the Elkins Law (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847, as preserved by amendment by Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 [Comp. St. 1913, § 8597]), there was no error in refusing defendant's request to charge that devices for rebates are not prohibited, unless property of the shipper was transported at a less rate than that named in the defendant's published tariffs, where the court had previously pointed out the necessary elements of the offense.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2011; Dec. Dig. ☞829.]

4. CARRIERS ☞38—PROSECUTION FOR REBATING—INSTRUCTIONS.

In a prosecution for rebating under the Elkins Law (Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847, as preserved by amendment by Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 [Comp. St. 1913, § 8597]), the statement of the court, after setting out the language of the act and discussing the allega-tions as to a device and the intention of the parties, to the effect that the indictment concluded with a charge that the defendant, through the device named, unlawfully gave a rebate to a named shipper in the transporta-tion of property in interstate commerce, was not objectionable as allowing the jury to find that the mere concoction of the device, without transpor-tation at a reduced rate, would justify a conviction.·

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. ☞38.]

In Error to the District Court of the United States for the East-ern District of Illinois; Francis M. Wright, Judge.

The Vandalia Railroad Company was convicted of rebating, and it brings error. Affirmed.

In 1905, the Lumaghi Coal Company, whose property was located on the lines of the Vandalia Railroad Company, was desirous of purchasing addition-al property on some of which, at least, it held options. It had not the necessary money, and, as its president testified, it was not in a position to borrow it at 2 per cent. interest as a regular banking proposition or from any ordinary sources, and would not have undertaken the purchase of the 9,000-acre tract, at a cost of $260,000, if compelled to pay the ordinary rates for money at that time. And so it applied to the Vandalia Railroad Company for a loan. This company, being unable under its charter either to loan money or to buy and sell coal lands and because of other practical difficulties, caused the Vandalia Mineral Company to be organized, which had the necessary powers. Being, however, without charter power to own stock of this latter company, it caused the stock to be held for it by the Granite Improvement Company. The controlling interest in both the Granite Improvement Com-pany and the Vandalia Railroad Company was owned by the Pennsylvania Company. It is conceded by appellant that, for the purposes of this case, all of the acts and doings of the Mineral Company and of the Granite Improve-ment Company are to be considered the acts of the Vandalia Railroad Com-pany.

Thereupon, in 1905, supplemented in 1906, a contract was made between the Vandalia Railroad Company, Vandalia Mineral Company, Lumaghi Coal Com-pany, and Louis F. and Joseph D. Lumaghi. Treating the Mineral Com-

pany as if it were the Vandalia Railroad Company, the contract, in substance, provided for a loan by the Vandalia Company to the Coal Company of $200,000, evidenced by notes of $20,000 each, bearing interest at 2 per cent. and falling due at the rate of one a year. The coal lands in question were to be conveyed to the Vandalia practically as security for the loan and were to be proportionately conveyed to the Coal Company on payment of each note. The Railroad was to construct, without cost to the Coal Company, tracks to such coal openings as might be developed; but it retained the right to use such tracks for the general business of the road and to remove them on failure of the Coal Company to operate the mines for three years. The Coal Company agreed to furnish the necessary right of way without cost to the railroad. The Railroad Company agreed to haul the tonnage mined from this property and other property of the Coal Company to East St. Louis at as low a rate as the general rate for like tonnage of any railroad entering East St. Louis. The Coal Company agreed that the Railroad Company should be the exclusive carrier of all its coal and minerals from all of its property, and that a violation thereof should cause a forfeiture of its right to the property. A minimum tonnage was fixed for each year. The Coal Company agreed to sell to the Railroad Company such coal as it might desire to buy for company use at $1.20 per ton, based upon the then wage scale and mining scale, and subject to increase or decrease as such scales should increase or decrease, and to release the Railroad Company from liability for damage to any building located near the tracks, whether occasioned by fire from locomotive sparks or otherwise. It was further agreed that, if the Coal Company should default on any interest note for six months, the Railroad had the option of surrendering the notes and being released from any further obligation to convey, the land. Every conveyance by the Railroad Company to the Coal Company was to contain a condition of forfeiture if the coal were not delivered exclusively to the Railroad Company for carriage.

At the time the contract was made, the Railroad was paying, not $1.20, but $1.10, per ton for its coal. It had never had any trouble in getting coal at market rates. Since the contract it had bought its coal from all the mines on its lines in proportion to the production by each during the prior year. While the price paid to the Coal Company was sometimes above and sometimes below the market, it was the same that was paid to the other companies. While, at one time, certain operators along its line had fixed a minimum price to be charged the Railroad, it had had no difficulty in buying in other markets. The chief clerk in the general manager's office of the Railroad, who testified to these facts, said on cross-examination that, if the contract in question had not been made, it would have been possible for all the coal owners in the vicinity to have combined into one association for the purpose of raising the price of coal to much in excess of $1.20 per ton.

The contract did not specify how the lender was to raise the money. In fact. it procured $240,000 from a bank, giving its notes, payable just as the Coal Company notes were payable, except that the interest was 4 per cent. instead of 2 per cent. In each of the years, 1910, 1911, and 1912, shipments were made by the Coal Company pursuant to the contract. The notes falling due in each of these years were paid by the Coal Company to the Railroad Company and by the Railroad Company to the bank, with the result that the Railroad Company paid in each of these years, on account of the money borrowed by it, a considerable sum in excess of the interest that it received on the money loaned by it. The Coal Company paid the tariff rate at the time of and for each transportation transaction referred to in the indictment.

The Vandalia Railroad Company, which offered no evidence, was found guilty under an indictment charging it with having given the Coal Company a rebate by means of the device as hereinabove set forth in respect to the transportation of certain specified car loads of coal whereby they were transported at a less rate than that named in the published tariffs, in violation of section 1 of the Elkins Law (Act Feb. 19, 1903, c. 708, as preserved by the amendment in Act June 29, 1906, c. 3591, § 2, 34 Stat. 587). The several counts were based on shipments made in the years 1910, 1911, and 1912, respectively.

Thomas W. White, of St. Louis, Mo., and L. O. Whitnel, of East St. Louis, Ill., for plaintiff in error.

Chas. A. Karch, of East St. Louis, Ill., and Henry S. Mitchell and August G. Gutherin, for the United States.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

MACK, Circuit Judge (after stating the facts as above). While a number of errors are assigned, but two have been argued: (1) The refusal of the court to direct a verdict for defendant; (2) the refusal to charge as requested.

[1] 1. No question of discrimination, whether just or unjust, by the Railroad as between competing coal companies is involved. The indictment charges a concession or rebate—a departure from the tariff rate in respect to the transportation of certain car loads. Giving a rebate "whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs" is one of the offenses enumerated in section 1 of the Elkins Law. The contract, the execution of the 4 per cent. notes and the 2 per cent. notes, their payment, and the resulting payment of the excess interest for and during the year in which the acts of transportation mentioned in the indictment occurred, are alleged in the indictment to constitute the device by means of which the Railroad knowingly and willfully gave the Coal Company a rebate in respect to the transportation in interstate commerce of the specified property "whereby said property was transported at a less rate and charge than that named in the tariffs."

The statute evidently aims to prohibit, not only discrimination as between shippers, but departure from the tariff rates, irrespective of its actual discriminatory effect. The history of this legislation demonstrates that both discriminations and rebates have ever been sought to be hidden under the most subtle diguises. Every device that seeks to cover up either a rebate or a discrimination in interstate transportation is denounced by the statute, provided only, as to a rebate, that thereby the property is actually transported at less than the tariff rate. That the full tariff rate is collected at the time of transportation does not negative the possibility of a rebate in respect thereto. The rebate may be in a lump cash sum in advance (United States v. Union Stockyards, 226 U. S. 286, 33 Sup. Ct. 83, 57 L. Ed. 226), or by later or earlier indirect payments (G. R. & I. Ry. Co. v. United States, 212 Fed. 577, 129 C. C. A. 113).

[2] While it is conceded that, if the effect of a contract to purchase tonnage would be to give an undue preference or advantage, such a contract would come within the inhibition of the Elkins Law, it is contended that a similar result would not follow if the effect were to cause only a departure from the tariff rate. In the Union Stockyards Case, however, a cash bonus, paid to a shipper for locating next to the stockyards, and giving the stockyards the exclusive transportation of its property, was denounced, not merely as an unjust discrimination, but specifically as a departure from rates which were not, but ought to have been, and, for the purposes of the case, were treated as if, published; and the Grand Rapids & Indiana Railway Company

was convicted under an indictment which charged the giving of a rebate alone, not a discrimination.

If, then, a direct cash payment for exclusive tonnage is a rebate in respect to property transported under such a contract, any device whereby a similar payment is made comes within the prohibition of the statute. A loan at less than the market rate of interest, like a lease at less than market rental (C., C., C. & St. L. Ry. Co. v. Hirsch, 204 Fed. 849, 853, 123 C. C. A. 145), is, in effect, a gift of the difference between the contract and the market rate, and is, in every respect, equivalent to a direct payment of that amount of money. The evidence detailed above shows clearly that, under all the circumstances, 2 per cent. was far below the market rate, and that the payment of at least the difference between 2 per cent. and 4 per cent., if given for the exclusive tonnage privilege, would be an unlawful rebate.

It is contended, however, that there were other considerations given by the Coal Company in addition to the exclusive tonnage; that the burden of proof is on the government to establish that these other considerations were not worth the entire difference between the 2 per cent. and the market rate of interest; and that the government has failed to make any such proof. Specifically, the defendant claims that the agreement to furnish coal at $1.20 a ton, subject only to the change in the wage scale and mining scale, was a consideration of great value. The implication is that the jury was bound, in the absence of direct proof, to consider that this value exceeded what would otherwise have been a rebate. The jury, however, were not without evidence tending to show the very slight value of this alleged insurance against a combination of dealers to raise the price of coal to the railroad. The fact that the company was actually paying $1.10, and not the stipulated price of $1.20, at the time the contract was made; the further fact that the company had never had any actual difficulty in getting coal at the market price, in themselves would have justified the jury in regarding this clause as a mere subterfuge, and of no value whatsoever.

The other alleged advantages to the railroad might well have been deemed either offset by the advantages to the other parties, as shown by the contract, or of no substantial value whatsoever. We conclude, therefore, that the evidence fully sustains the charge that the defendant knowingly gave a rebate in respect to the interstate transportation whereby such property was transported at a less rate than that named in the tariff.

2. At the conclusion of the charge, defendant's attorney requested certain additional charges successively. To each of these in turn the trial judge either gave or refused his assent, or expressed his own modifying views. The last request and the action of the court thereon are thus presented in the bill of exceptions:

"Mr. Whitnel: If the court please, one further charge. I ask the jury be charged that devices or rebates are not contrary to law, and prohibited, unless by such devices or rebates property of the shipper, the Lunaghi Coal Company in this case, was transported at a less rate than that named in the tariffs published and filed by the Vandalia Railroad Company.

"The Court: Well, I refuse that instruction. It is not necessary, and

add this to what I have said: "It is not necessary for the government to show that the money that was paid, that specific money was rebating or reducing; that's all. It is sufficient, if from the whole evidence, as I have said before, you believe from the whole evidence that the defendant did pay one or more sums of money, for the purpose of reducing the costs of the transportation of this property, and that must be determined from the whole evidence.

"To which ruling of the court the defendant by its counsel asked for and was granted an exception."

Whether defendant excepted to the refusal so to instruct, or to the statement of the court, or to both, is not clear. Indeed, it is so vague that, in preparing the assignments of error, counsel deemed it to extend to the rulings on every request.

[3] Waiving this, however, we consider the only error in regard thereto presented in the brief:

That "the jury were given to understand that thereby the Vandalia should be convicted of concocting a device, and not of transporting the property at less than the published rate."

While the request stated concisely a correct and applicable legal proposition, and might well have been given, the trial judge did not err in regarding it as not absolutely necessary, inasmuch as the court had theretofore pointed out the necessary elements of the offense.

[4] After giving the language of the act and discussing the allegations as to a device and the purpose and intention of the parties, the court said:

"The indictment concludes with this sort of a charge. That is what you are to determine and try by the evidence in the case: 'And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Vandalia Railroad Company, at the time and place and in the manner and form and through the device aforesaid, did conduct and transport property into and through said Eastern district of Illinois, and unlawfully did knowingly and willfully offer, grant, and give to said Lumaghi Coal Company a rebate in respect to the transportation of said property in interstate commerce from said Lumaghi Coal Company's mine in Illinois to the state of Missouri.'"

This is a direct statement that it was the duty of the jury to determine, among other things, whether or not the defendant did transport the property and did knowingly give a rebate in respect to such transportation. The jury could not have understood therefrom that the mere concoction of the device without the transportation at a reduced rate resulting therefrom would justify a verdict of guilty.

The additional statement made by the judge after refusing the request indicates that he believed defendant was endeavoring to have him hold that payment of a lump sum applicable to any and all subsequent shipments could not be deemed a rebate as to any specific transportation. The assertion that it was not necessary for the government to show that "the money paid, the specific money," was rebating, was intended as a denial of the supposed contention. In adding that "it is sufficient if the jury believe from the whole evidence that the defendant did pay one or more sums of money for the purpose of reducing the cost of the transportation of this property" the court neither held nor intended to hold that this was the only element necessary

to be established, but only that, to establish the rebate element, it would be sufficient for the jury to find from the entire evidence, including as well the excess interest payment as the payment of the tariff rate at the time of shipments, that a reduction from the lawful rate had in fact been made.

Judgment affirmed.