### PENNSYLVANIA CO. v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. January 7, 1919.)

No. 2507.

1. CARRIERS &⊃38—INTERSTATE COMMERCE—REBATES.
   Claims for refunds for switching charges paid on prior inbound shipments into Chicago from the West could not be granted or enlarged by a subsequently enacted tariff, and hence the joint freight tariff, effective on the Pennsylvania line January 18, 1907, was not authority for a refund on inbound shipments received prior thereto.

2. CARRIERS &⊃38—SWITCHING CHARGES—REBATES.
   The Chicago Joint Minimum Switching Tariff, which became effective November 1, 1898, relating to absorption of switching charges and rebates, had no relevancy to switching charges on inbound shipments from the line of a Western road.

3. CARRIERS &⊃38—REBATES—ELKINS ACT.
   Actual discrimination between shippers is not a necessary element of a violation of the Elkins Act, as amended by the Hepburn Act (U. S. Comp. St. § 8597); departure from the published rate being sufficient.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

The Pennsylvania Company was convicted for violation of the Elkins Act, as amended by the Hepburn Act, and it brings error. Affirmed.

Timothy J. Scofield, of Chicago, Ill., for plaintiff in error.

Charles F. Clyne, of Chicago, Ill., and J. Carter Fort, for the United States.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

&⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ALSCHULER, Circuit Judge.   Plaintiff in error was convicted un-
der an indictment of five counts charging violation of section 1 of the
Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 847), as amended by the
Hepburn Act (Act June 29, 1906, c. 3591, 34 Stat. 586 [Comp. St. §
8597]), in which is provided:

"And it shall be unlawful for any person, persons, or corporation to offer,
grant, or give, or to solicit, accept or receive any rebate, concession, or dis-
crimination in respect to the transportation of any property in interstate or
foreign commerce by any common carrier subject to said act to regulate com-
merce and the acts amendatory thereof whereby any such property shall by
any device whatever be transported at a less rate than that named in the tar-
iffs published and filed by such carrier, as is required by said act to regulate
commerce and the acts amendatory thereof, or whereby any other advantage
is given of discrimination is practiced.  Every person or corporation, whether
carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept,
or receive any such rebates, concession or discrimination shall be deemed
guilty of a misdemeanor and on conviction thereof shall be punished by a fine
of not less than one thousand dollars nor more than twenty thousand dollars."

Each of the counts sets forth shipments in 1912 by the W. H. Mer-
ritt Company, of Chicago, of cars of grain aggregating 24, on each
of which plaintiff in error unlawfully gave the shipper a rebate or con-
cession of $2.   That the rebate or concession of $2 per car was in
fact received by the shipper from plaintiff in error is not controverted,
but is sought to be justified.

The justification for these refunds made in connection with the ship-
ments of 1912 is asserted to be that they arose out of bills paid in the
years 1900 to 1906 by the former owners of the Merritt elevator, for
switching to the elevator cars of grain arriving in Chicago over West-
ern roads, and that, under the tariff then in force, charges paid by the
consignees for switching to elevators cars of grain arriving in Chicago
over Western roads would by Eastern roads be absorbed in or credited
upon the freight charges from the elevator to Eastern points, for like
tonnage of such grain carried by such Eastern roads, on presentation
to the eastbound carrier of an expense bill showing the prior payment
of such a switching charge.

There was in vogue in the city of Chicago during 1912 a system or
transit arrangement under which, when cars of grain came into the
city from Western points, they might be switched to and unloaded into
a local elevator, and upon reloading the same or similar tonnage of like
grain, for shipment to an Eastern point, the shipper might, on surren-
der of his freight bill for the inbound shipment to Chicago, secure the
lower through rate from Western point of origin of an inbound ship-
ment to point of destination of the outbound shipment.   The cars de-
scribed in the several counts were shipped out in 1912 from the Mer-
ritt elevator East over plaintiff in error's railroad, and, in order to
obtain the advantage of a through rate, were stated to be the shipments
of certain cars of grain shortly theretofore inbound to Chicago, and
switched to and unloaded into the Merritt elevator at Chicago.   The
through rate through Chicago was thus secured; but thereupon the
shipper also presented to this carrier further claims for $2 applicable to
each of such cars so shipped East, predicated upon inbound switching
charges to that elevator, of $2 per car which, as stated, had been paid

from 1900 to 1906; expense bills for each of such switching charges being presented to the carrier, and the $2 per car paid accordingly to the Merritt Company. It is upon the payment to the shipper of these claims or refunds of $2 per car that the indictment is predicated.

In the published tariff in force when all or most of the cars referred to in the indictment were shipped, it is provided:

"The period of time allowed for transit privileges will be 12 months from the date of inbound carriers' freight bills. At the expiration of the time limit transit privileges shall absolutely cease and full local rates, commodity or class, shall be assessed for any movement whatsoever, both into and out of the transit point."

Under this limitation, which became effective in September, 1912, an inbound Western grain shipment, made more than one year before the date of the outbound Eastern shipment, could not be used to obtain the benefit of the through rate, and an inbound switching charge incurred more than one year prior to the outbound shipment could not in any event be lawfully rebated or paid to the shipper upon the outbound shipment being made, unless, perhaps, by virtue of some previous tariff it became a lawful claim against the outbound carrier.

[1, 2] It is contended for plaintiff in error that the obligation of the outbound carrier to absorb or refund the inbound switching charge accrued under prior tariffs wherein there was no time limit, and that claims so arising could not be affected by tariffs subsequently adopted. But we must look to the tariff in force when the inbound switching charges were incurred and paid by the consignee, to determine whether or not there then accrued any such claim for refund of switching charges, which might then or thereafter be the subject of a refund.

We are referred by plaintiff in error to the joint freight tariff effective on the Pennsylvania line January 18, 1907, as authority for these refunds. It provides:

"When tonnage in grain or any products is shipped east or south via Pennsylvania lines from elevators, mills or malt houses located as above, which is equal to the tonnage in grain obtained in cars originally switched to such elevators, mills or malt houses the inbound switching charges of the Pennsylvania Company will be considered a part of the through rate and will be refunded."

Whether or not this tariff provision would authorize the refund at any time thereafter by the carrier of eastbound shipments of switching charges paid on prior inbound shipments from the West received after the tariff provision became effective, need not be considered, since the switching charges here in question were paid in the years 1900, 1902, 1903, 1904, and 1906, all prior to the effective date of this tariff. If a subsequently adopted tariff will not abrogate or limit claims for refund which accrued prior thereto, it is equally true that such claims will not be created or enlarged by a subsequently enacted tariff. Clearly this tariff of 1907 did not give rise to refunds for switching charges which were paid from 1900 to 1906.

The only other tariff appearing in evidence which seems to be seriously put forth on behalf of plaintiff in error in justification of the

payment in 1912 of these switching charges which accrued from 6 to 12 years previously, is the Chicago Joint Minimum Switching Tariff, which became effective November 1, 1898. The part relied on reads:

"A. All freight coming from warehouses, elevators or industries located on Western roads or other foreign connections, or from their tracks, will be subject to switching charges as per their switching tariffs, in addition to current rates from Chicago.

"B. Where any Western road's switching charge is not uniform to all Eastern lines, the Eastern line to which the higher charge is made may, if it so desires, absorb the actual difference to equalize such switching charge; difference of switching shall not be equalized by cartage, nor difference in location or distances equalized by switching, nor shall difference in location or distances be equalized by the payment of cartage, nor shall payment of cartage be made in lieu of switching.

"C. Where freight originates at warehouse or industries located directly on the tracks of an Eastern line, any other Eastern line taking such freight may (excepting traffic destined to Canadian territory, for which see special circulars), if it so desires, absorb all switching charges on same; difference of switching shall not be equalized by cartage, nor difference in location or distances equalized by switching, nor shall difference in location or distances be equalized by the payment of cartage, nor shall payment of cartage be made in lieu of switching."

Paragraphs A and B clearly have no reference to a situation like that here presented. Paragraph C, which relates to freight that originates at a Chicago warehouse on an Eastern line, and the absorption of switching charges by any other Eastern line which carries the freight, applies to the switching charges from the warehouse on the line of the Eastern road on which the freight originates to the line of the other Eastern road which carries the freight East, so that there may be parity between all the Eastern roads respecting shipments from a warehouse located on any one of them. It has no relevancy to switching charges on an inbound shipment to such warehouse from the line of a Western road.

We find nothing in the tariffs shown in evidence which affords any justification of these payments of $2 per car made to the shipper in 1912.

[3] It is contended that plaintiff in error could not properly be convicted of a violation of the amended Elkins Act, because there was no evidence that the privileges accorded to this shipper were denied to any other shipper, and that therefore there was no discrimination shown. The answer is that actual discrimination between shippers is not a necessary element of a violation of the amended Elkins Act: Vandalia R. Co. v. U. S., 226 Fed. 713, 141 C. C. A. 469 (7 C. C. A.); C., St. P., M. & O. Ry. v. U. S., 162 Fed. 835, 90 C. C. A. 211 (8 C. C. A.); C. & A. Ry. v. U. S., 156 Fed. 558, 84 C. C. A. 324, 26 L. R. A. (N. S.) 551 (7 C. C. A.)

The improper allowance and payment of $2 per car by the carrier to the shipper upon these eastbound shipments is such a departure from the published rate, and such a rebate or concession granted and given by the carrier, as is denounced by the amended Elkins Act.

The judgment is affirmed.