## NORTHERN CENTRAL RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. February 27, 1917.)

No. 73.

1. CRIMINAL LAW ⬅113—INTERSTATE COMMERCE ACT—GIVING OF REBATES—JURISDICTION OF PROSECUTION.

Under the provision of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847, as amended by Hepburn Act June 29, 1906, c. 3591, § 2, 34 Stat. 587 (Comp. St. 1913, § 8597), which makes the granting or receiving of rebates unlawful, giving jurisdiction of prosecutions thereunder to any court of the United States having jurisdiction of crimes within the district in which such violation is committed, "or through which the transportation may have been conducted," it is sufficient to sustain the jurisdiction of a court that the shipments with respect to which it is charged that rebates were granted were transported into the district, and such jurisdiction is not defeated by the fact that the arrangement was made, or the rebates paid or settled for, in another district.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 190, 232.]

2. CARRIERS ⬅38—INTERSTATE COMMERCE ACT—REBATES.

Any pecuniary inducement held out to shipper to procure his business over a particular railroad is or may be a rebate or concession, within the prohibition of the Interstate Commerce Acts.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97.]

3. CARRIERS ⬅38—INTERSTATE COMMERCE ACT—GIVING OF REBATES.

Defendant, an interstate railroad company, was the owner of coal lands which it leased in 1878, and by renewals thereafter to a mining company on a royalty basis. The coal produced therefrom was shipped over defendant's road. From 1905 to 1913, and until the matter was called to the attention of the Interstate Commerce Commission, defendant collected no royalties from the mining company and made no charges on its books therefor, although the mining company produced above 1,500,000 tons of coal annually, which defendant transported at the regular published rates. Held, that such facts were sufficient to sustain a verdict finding that defendant had intentionally granted to the mining company as a shipper a concession from the established rates in violation of Elkins Act Feb. 19, 1903, c. 708, § 1, as amended by Hepburn Act June 29, 1906, c. 3591, § 2.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97.]

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of New York.

Criminal prosecution by the United States against the Northern Central Railway Company. From a judgment of conviction, defendant brings error. Affirmed.

The plaintiff in error hereinafter is referred to as the defendant. The defendant is a corporation organized under the laws of the states of Maryland and Pennsylvania, and is a common carrier engaged in the transportation of anthracite coal in carloads and other property for hire wholly by railroad in interstate commerce on and over its railway route from Mt. Carmel and Shamokin in the state of Pennsylvania, and from certain collieries in the county of Northumberland, in the state of Pennsylvania, to various points in the Western district of

the state of New York, connecting with the lines of the Pennsylvania Railroad Company and with those of the New York Central & Hudson River Railroad Company.

Francis I. Gowen, of Philadelphia, Pa., and Frank Rumsey and H. J. Adams, both of Buffalo, N. Y., for plaintiff in error.

Henry S. Mitchell, Sp. Asst. Atty. Gen., for the United States.

Before COXE, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. The defendant was charged with a violation of the Elkins Act of February 19, 1903, as amended by the Hepburn Act of June 29, 1906. The act in terms forbids railroad companies engaged in interstate commerce from giving any rebates or concessions to any shipper which are contrary to the published and filed tariff rates. That act provides in part as follows:

"It shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said act to regulate commerce and the acts amendatory thereof whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said act to regulate commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than one thousand dollars nor more than twenty thousand dollars."

The indictment charges defendant with granting rebates and concessions to the Mineral Railroad & Mining Company, hereinafter called the Mining Company, on shipments of anthracite coal contrary to the provisions of the above act. In addition to the necessary formal allegations, each count described a certain carload of anthracite coal, and alleged that it was mined by the Mining Company from lands it leased from defendant near Shamokin, Pa.; that the coal was transported thence by defendant and its connecting carrier, the New York Central & Hudson River Railroad Company, through the Western district of New York, to a certain point therein; that a rate for such transportation was lawfully established in the joint tariffs of the said carriers; and that defendant, by the device of waiving the collection from the Mining Company of royalties of 28 cents per ton, provided for in its lease, granted to that company rebates and concessions in respect to the transportation of the coal whereby it was transported at less than the established rate and an advantage was given to that company.

The various counts of the indictment are similar in form and alike, except as to the date of shipment, number of pounds, kind of coal shipped, the number and description of car, the name of consignee and destination, and it is sufficient to state that each of the 50 cars described in the separate counts of the indictment were consigned to points within the Western district of New York and on the line of

the New York Central & Hudson River Railroad Company. The trial court held that the indictment, which originally consisted of 50 counts, alleged 17 separate and distinct offenses, all of the shipments in question having been made in 17 months, and that there was but a single offense in any given month. The number of the counts was accordingly reduced to 17 by the court. A plea of not guilty was entered as to each count. The trial resulted in the conviction of the defendant as charged on 17 counts and defendant was fined $20,000 and judgment was entered for that amount.

It appears that the defendant, during and throughout the whole period of time involved in the indictment, was and is the owner in fee and the lessee of approximately 4,948 acres of coal-producing lands situate in the county of Northumberland, near the borough of Shamokin, in the state of Pennsylvania; that on July 10, 1878, defendant by a lease which became effective on January 1, 1878, and remained in force until December 21, 1887, leased to the Mining Company all of the said coal-producing lands for mining purposes and conveyed to it the exclusive right to mine, prepare, and carry away coal from the said properties, and to occupy and use the lands, mines, slopes, breakers, pumps, and other machinery, houses, shops, stables, buildings, and all other improvements, and to cut timber from the lands for use in the mines and buildings connected with the aforesaid coal-producing lands; that pursuant to the terms of the said lease and in consideration of the rights and privileges therein conveyed to it, the Mineral Railroad & Mining Company agreed to pay defendant for each and every gross ton of coal of 2,240 pounds weight, mined and sold by it from the coal-producing lands on or after January 1, 1878 (but not including any coal used or to be used by the Mineral Railroad & Mining Company for mining purposes), the sum of 20 cents for all prepared sizes, and 10 cents for nut coal and all smaller sizes mined and produced from the said properties, such payments to be made thereafter not later than the 25th day of each and every month for such coal sold during the previous month; that various extensions of the lease were made from time to time, by which it was extended to February 27, in the year 2862; that by the last extension royalties were to be paid during the extended term at the rate of 28 cents per ton, instead of at the rates of 10 to 20 cents per ton as originally provided. Royalties were to be paid not later than the 25th day of the month following the sale of the coal mined. Provision was also made for the cancellation of the lease at the end of any calendar year at the option of either lessor or lessee. It further appears that pursuant to the terms of the lease and its extension the Mining Company entered into the occupancy, use, and possession of the leased properties and has ever since been in exclusive possession of them; that it has mined from the properties large quantities of anthracite coal to the extent annually of upwards of 1,600,000 tons.

The coal was shipped under an arrangement between the Mining Company and the Susquehanna Company. The Mining Company is a corporation organized under the laws of Pennsylvania. Its chief business is the production and selling of anthracite coal, and it maintains

an office in the city of Philadelphia. Two-thirds of its stock was owned by defendant. It produced the greater part of its output from the lands leased from defendant. By virtue of the agreement the Susquehanna Coal Company, which is also a Pennsylvania corporation engaged in the production and selling of anthracite coal, throughout the entire period involved herein acted ostensibly as selling agent and shipper for the Mining Company. It accepted, shipped, marketed, and sold all the anthracite coal mined and produced by the Mining Company, and it paid over to the latter the entire net proceeds derived from the sale of the coal produced by the Mining Company, without making any charge for its services as selling agent. The two companies occupied the same offices and had the same officers and directors, the officers' salaries being paid in part by each company. Their relations were such that their mutual president referred to the Mining Company as the "Mining Department" of the Susquehanna Company. The arrangement between them was as follows: The Mining Company loaded the coal it mined into defendant's cars. The Susquehanna Company sold the coal and turned over to the Mining Company the net proceeds less the selling expenses. The Susquehanna Company gave the shipping instructions to defendant, and the coal was transported under waybills in which the Susquehanna Company was named as the shipper.

The Mining Company never paid a dividend. From 1903 to December 31, 1912, its balance sheets showed liabilities in excess of assets. In 1903 and 1905 it made partial payments of accrued royalties. From 1905 to December 31, 1913, it paid no royalties. After 1903 it received no bills for royalties from defendant and neither company kept any record of them. On the other hand, defendant derived substantial revenues from transporting all the coal produced and sold by the Mining Company. The latter company produced under this lease in 1911, 1,682,890 tons; in 1912, 1,618,164 tons; and during the first nine months of 1913, 1,343,229 tons. Included in those tonnages were the various carloads of coal described in the indictment.

In November, 1913, defendant's comptroller was examined before the Interstate Commerce Commission as to its failure to collect royalties from the Mining Company. On February 19, 1914, defendant collected from that company $335,588.35 in cash, and on June 30, 1914, entered a charge of $3,126,778.08 against that company, and received from it that amount of land bonds of Susquehanna Coal Company in settlement of royalties accrued from 1906 to December 31, 1913. The Mining Company procured the cash and bonds by selling out its interest in the lease in question and its mining property to Susquehanna Company.

The various carloads of coal described in the indictment were transported by defendant and its connecting carrier to points in the Western district of New York. A rate of $2 per ton was lawfully established in the joint tariffs of the said carriers and in force during the entire period in question. The connecting carrier collected transportation charges at that rate from the various consignees and paid defendant its proportionate share thereof.

The theory of the government in this prosecution is that the defendant granted a concession to the Mining Company of 28 cents per ton because of its failure to collect such royalty on the coal it transported. The theory of the defense is that the payment of royalty was in no way dependent upon and had no connection with the act of transportation, and so was not within the terms of the Elkins Act as amended by the Hepburn Act.

[1] The defendant challenges the jurisdiction of the trial court, and assigns as error its failure to advise the jury to acquit the defendant upon the ground that the evidence shows that the offenses alleged in the indictment were all committed outside of the court's jurisdiction. It asserts that, as the lease fixed no place for the payment of the royalty, it was payable at the general offices of the defendant in the city of Philadelphia, and not at any point within the Western district of New York. But the place where the royalty was to be paid has no bearing on the question of jurisdiction. It is sufficient to support the court's jurisdiction that coal was transported into the Western district of New York. The act expressly provides as follows:

"Every violation of this section shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed, or through which the transportation may have been conducted; and whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein." 34 Stat. 588.

In view of the positive command of the second section of the act that no departure from the rate published and filed by the carrier shall be made "directly or indirectly," the Supreme Court in New Haven R. R. v. Interstate Commerce, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515 (1906) declared that:

"The all-embracing prohibition against either directly or indirectly charging less than the published rates shows that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about."

So that the question involved is whether the arrangement which defendant had with the Mining Company was a method of dealing by which the forbidden result was brought about.

In the New Haven Case the court held the act violated under the following circumstances: The Chesapeake & Ohio Railway Company bought coal from mining companies, transported the same over its lines, and disposed of it at a selling price insufficient to yield the purchase price plus the tariff rates for its transportation. The Chesapeake & Ohio Company made an agreement with the New Haven Company to sell the latter 60,000 tons of coal, to be carried from the Kanawha district in West Virginia and then by water to Connecticut, for delivery to the buyer at $2.75 per ton. It had performed a part of its contract. The price of the coal at the mines, where the Chesapeake & Ohio Company bought it, and the cost of transportation from Newport News to Connecticut, was $2.47 per ton. This left to the Chesapeake & Ohio Company about 28 cents a ton for carrying the coal

from the Kanawha district to Newport News, whilst the published tariff for like carriage from the same district was $1.45 per ton. This was held to be a violation of the act.

In United States v. Union Stockyard & Transit Company, 226 U. S. 286, 33 Sup. Ct. 83, 57 L. Ed. 226 (1912), the Supreme Court enjoined the Union Stockyard & Transit Company, a carrier, from fulfilling its agreement to contribute $50,000 to the construction of a new packing plant. By the same agreement the packers had agreed to slaughter and pack only such live stock as passed through the Union Stockyard & Transit Company's yards, at the customary rate of charge, or to pay the charges which would have accrued had those yards been used. The Supreme Court was convinced that the $50,000 was contributed in consideration of the charges to be collected on the live stock, and therefore that the net result would be to reduce those charges. The agreement was held to be in violation of the Elkins Act.

In Cleveland, C., C. & St. L. Ry. Co. v. Hirsch, 204 Fed. 849, 123 C. C. A. 145 (1913), the Circuit Court of Appeals in the Sixth Circuit held that a contract by which an interstate railroad carrier leased ground to a dealer in scrap iron for a term of five years at a rental not much exceeding one-tenth of its actual rental value, in consideration of receiving the lessee's shipments at regular rates, was a violation of the Elkins Act.

In Vandalia R. Co. v. U. S., 226 Fed. 713, 141 C. C. A. 469 (1915), the Circuit Court of Appeals in the Seventh Circuit sustained a conviction of the railroad company under an indictment charging it with the offense of giving a rebate contrary to the provisions of the Elkins Act. In that case there was a contract between the railroad company and a mining company, it being agreed that the latter should have a loan from the former at 2 per cent. interest and should ship exclusively over the former's lines at full tariff rates and sell coal to the railroad for its use at $1.20 per ton. The jury found this was a device whereby the coal was in effect transported at less than tariff rates. The court held that the fact that the full tariff rate is collected does not negative the possibility of a rebate in respect thereto, either in a lump cash sum in advance, or by later or earlier indirect payments. It declared that a loan at less than the market rate of interest, like a lease at less than market rental, is in effect a gift of the difference between the contract and the market rate, and is in every respect equivalent to a direct payment of that amount of money.

[2] The cases show that it is the law that any pecuniary inducement held out to a shipper to procure his business over a particular railroad is or may be a rebate or concession within the prohibition of the Elkins Act.

[3] But as the original lease was made in 1878, and the Elkins Act was not passed until 1903, it is said that the defendant at the time it made the lease could not have made it to circumvent the statute. That is, of course, conceded. But the failure to collect the royalties from 1905 through all the years down to December 31, 1913, may have been a device to give a concession in consideration of the transportation of the coal, and if it was it involved a violation of the act.

Whether it was such a device, and whether the purpose was to give a concession or discrimination which resulted in shipping the coal to its destination at a less rate than that mentioned in the tariff, was for the jury to determine. The verdict of the jury has established the fact that the failure to collect the royalties was with the intention of giving the Mining Company an advantage or concession, and that it resulted in the transportation of the coal at less than the established rates. It seems to us that the evidence is such as to justify the jury in coming to the conclusion it did as to the motive and consequent intent of the defendant.

In the instant case there was no deduction from the actual tariff rate, and there was no direct rebate. The judge in his charge so informed the jury, adding that the statute was broad and comprehensive:

"It does not merely forbid the giving of a rebate out of the rate that the shipper or the consignee pays; but, as I have indicated to you, if the railroad company by any device, plan, or method gives to a shipper a refund or advantage or concession which, if given, operates as a rebate or refund, then the statute is violated."

Again in his charge he said:

"If you believe from the evidence that the purpose was to give a concession or discrimination which resulted in shipping the coal to its destination at a less rate than that mentioned in the tariff, then I conceive that the statute has been violated, irrespective of whether the Susquehanna Coal Company was the actual shipper or the Mining Company."

Again in his charge he said:

"The evidence in this case, and this entire controversy, in its last analysis, will turn upon the question of what you may believe with reference to the intention of the defendant railroad company, as to whether the intention was that the Mining Company should have an advantage or privilege or concession or whether it was merely an honest purpose to carry it along for a period of time on account of its financial embarrassment, but to ultimately collect the royalties."

And referring to the subsequent payment of the royalties he said:

"In other words, if during this period of time specified in the indictment there was an intention on the part of the railway company to give to the mining company a concession, then the offense forbidden by the Elkins Act was completed and consummated, and the subsequent payment after the offense was discovered obviously cannot be held to excuse the violation of the statute."

The charge was full and clear and accurate. If the arrangement made with the Mining Company constituted a device for effecting a reduction in rates, or for giving an advantage to the shipper, and was so intended, the defendant was guilty of a violation of the statute. The question whether there was an intention to accomplish such a result was left to the jury under appropriate instructions, and the jury has found that such intention did exist. The defendant's guilt is thereby established.

Judgment affirmed.

HOUGH, Circuit Judge (dissenting). This was a criminal prosecution, and there was no evidence at all of violation of the act, or of

criminal intent, except the continuance or maintenance of relations between the railway and the Mining Company, which began long before the Elkins Act became law. From this alone the jury was permitted to infer the commission of a crime.

Under such a ruling a creditor, who is also a carrier subject to the act, is indeed between the devil and the deep sea. If all traffic is refused, the functions of a common carrier are abnegated; if traffic as per published tariff is accepted, a crime is said to be committed; if payment of debt is insisted upon as a prerequisite to the transport of goods, the debtor is broken, and both debt and traffic are lost, until (at the best) some reorganization emerges from the ruins.

The statute does not compel such result, and from it I dissent.