UNITED STATES of America, Plaintiff,

v.

KEY LINE FREIGHT, INC., Defendant.

No. G74–122 Cr.

United States District Court,
W. D. Michigan, S. D.

March 10, 1977.

Robert C. Greene, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff.

Robert A. Sullivan, Northville, Mich., for defendant.

## OMNIBUS OPINION

FOX, Chief Judge.

Defendant Key Line Freight, Inc., has been charged in a 28-Count Information with giving rebates to shippers in violation of 49 U.S.C. § 322(c) which provides:

"Any person, whether carrier, shipper, consignee, or broker, or any officer, employee, agent, or representative thereof, who shall knowingly offer, grant, or give, or solicit, accept, or receive any rebate . . . or by any other means or device, shall knowingly and willfully assist, suffer or permit any person or persons, natural or artificial, to obtain transportation of passengers or property subject to this part for less than the applicable rate, fare, or charge . . . shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than $200 nor more than $500 for the first offense . . . .."

The information alleges in each count that the defendant carrier furnished an employee of a particular shipper an expense-paid trip to the Kentucky Derby on May 6, 1972. The alleged rebate, being the value of the expense-paid trip, varied in each count from $148.90 to $448.60. Each count alleged that these amounts were rebates on a particular shipment made at some time after May 6, 1972. The scheduled tariff charge for each of said shipments is set forth in each count and varies in amount from $8.65 to $419.47.

Count One is fairly representative of the 28 counts:

"On or about May 6, 1972, in the Western District of Michigan Key Line Freight, Inc., defendant, a motor carrier of property subject to Part II of the Interstate Commerce Act (Title 49, Chapter 8, U.S.Code) did, in violation of 49 U.S.Code 322(c), knowingly and unlawfully offer, grant and give a rebate to SpeeDee Check Out Systems, Inc., a shipper, in that said defendant furnished George J. Glupker, Jr., an employee of said shipper, with a valuable consideration in the amount of $148.90 through the device of an expense paid trip to the Kentucky Derby. This constitutes a rebate and offset against the lawful freight charge of $232.73 specified in the tariff of the defendant on file with the Interstate Commerce Commission. This freight charge was collected by the defendant from SpeeDee Check Out Systems, Inc., on or about May 18, 1972, for the transporta-

tion of crates counters N.O.I. performed by the defendant on or about May 18, 1972, by motor vehicle over the public highways from Grand Rapids, Michigan, to Bellvue, Nebraska."

Defendant having waived its right to jury trial, and United States consenting to that waiver, trial was held before the Court on October 19, 1976.

Previous to trial, defendant moved to dismiss the information upon the following grounds: (1) that the allegations do not constitute a violation of the statute since bare and unrelated entertainment without a causal connection to tariff charges or traffic tendered does not amount to a rebate, (2) that the constitutional rights of the defendant are violated in that the information requires a broadening of the term "rebate" which is improper, and (3) that the statute and administrative interpretations are vague and fail constitutionally. This motion to dismiss was denied in an opinion entered October 8, 1975. Because many of the issues raised by defendant in the motion to dismiss were raised again by defendant at trial, the opinion of this Court denying that motion is hereby incorporated in this Omnibus Opinion and attached hereto as Appendix A.

On the date of trial and before the introduction of testimony, defendant renewed its motion to dismiss the information. The basis for this motion was that the information fails to allege that defendant's actions were a willful violation of 49 U.S.C. § 322(c). Defendant apparently grounds this contention upon the fact that § 322(c) requires that a "device . . . to obtain transportation of passengers or property subject to this part for less than the applicable rate, fare, or charge" must be done "knowingly and willfully" and that one phrase of each Count of the Information states that the alleged rebate was accomplished "through the device of an expense paid trip to the Kentucky Derby." Defendant, however, ignores the fact that the information alleges that defendant did "knowingly offer, grant and give a rebate" and that the Derby trip "constitutes a re-

bate and offset against the lawful freight charge." In fact, defendant's trial brief admits that, in light of the statutory language, the activity alleged is the grant of a rebate. Defendant's Trial Brief at 9. As I stated in my opinion denying defendant's motion to dismiss, the information as it stands is sufficient. The government need prove beyond a reasonable doubt only that defendant did "knowingly offer, grant, or give" a rebate. Willfulness need not be shown. For this reason, defendant's motion to dismiss the information was denied.

The parties stipulated to a number of facts. A copy of that stipulation is attached hereto as Appendix B and is hereby made a part of this Omnibus Opinion. Called as witnesses at the trial were John F. Rauch, Sales Manager of Key Line at the time of the Derby trip; Daniel B. Wallace, Secretary-Treasurer of W–B Advertising, formerly Wallace-Blakeslee Advertising, which is defendant's public relations firm and which set up the Derby trip; and Daniel A. Darling, Vice President of the defendant. Additionally, the government offered the testimony of Nicholas F. Williams, a transportation rate tariff examiner for the Interstate Commerce Commission. Mr. Williams was stipulated by the defendant to be an expert witness and testified that an examination of defendant's tariff schedules at the time of the Derby trip show no application to include the Derby trip in an increase in tariff.

Stated simply and taken in the light most favorable to the defendant, the testimony of witnesses Rauch, Wallace, and Darling was as follows: That for a number of years defendant had had problems obtaining traffic on its Michigan to Louisville route; that traffic from Louisville had always exceeded traffic to Louisville, requiring defendant to "dead-head" trucks to Louisville; that advertising and visits by salesmen failed to increase defendant's share of the Michigan-Louisville market; and that defendant's public relations firm devised the Kentucky Derby trip as a promotional activity. Defendant's representatives also testified that there was no intent thereby to give, grant,

**94**

or offer a rebate to the respective shippers; that the trip was not intended to reward shippers for past, present, or future traffic; and that the trip was not conditioned on past or present traffic with defendant. Assuming all this to be true, I am still compelled to find that defendant did "knowingly offer, grant or give," rebates in violation of 49 U.S.C. § 322(c) and that the government did prove these violations beyond a reasonable doubt.

■■■ As I stated in my opinion denying defendant's motion to dismiss the information:

"The cases hold that the Elkins Act was to prevent any and all means that might be resorted to to obtain or receive concessions and rebates from the published tariffs. *Armour Packing Co. v. United States,* 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1907); *Vandalia R. R. Co. v. United States,* 226 F. 713 (6th Cir. 1915); *Northern Central Ry. Co. v. United States,* 241 F. 25 (2d Cir. 1917).

. . . . .

It is clear, therefore, that since any device which results in the intended prohibition is an unlawful rebate, an expense-paid trip to the Kentucky Derby for shipper employees can be unlawful if the result is the prohibited deviation from the published tariffs.

The issue therefore concerns whether or not the information alleges sufficient facts. The elements of the offense are (1) the granting or giving of a rebate (2) from the published and filed rates (3) for the transportation of property (4) by a carrier engaged in interstate commerce. *Chicago, St.P., M. & O. Ry. Co. v. United States,* 162 F. 835, 838 (8th Cir. 1908)."

I find that the Derby trip was the giving, granting, or offering of a rebate, from the published and filed rates for the transportation of property by a carrier engaged in interstate commerce. By supplying the Derby trip to employees of its shippers, the defendant thereby received from each of those shippers an amount for transportation of property less than its published tariff.

■ I am aware of the decision in the case of *ICC v. B. F. Walker, Inc.,* No. C–3759 (D.Colo.1974) in which the Court denied injunctive relief under § 322 where a carrier permitted employees of its shippers, and their families, to occupy a condominium in Aspen, Colorado free of charge for recreational visits. The Court in *Walker* based its opinion upon the fact that it could find "no relationship . . . between the volume of freight of a particular shipper and the period somebody was permitted to live in a condominium in Aspen." Quite frankly, were the facts in the *Walker* case before me, I would come to a different conclusion than the District Judge there did. As was implicit in my opinion denying defendant's motion to dismiss, there need be no causal relationship between the prohibited act and the tariff charge or the subsequent movement of traffic.

■ Defendant argues that its action was not within the scope of the statute as it was offered to all potential Louisville shippers and that, where no advantage to a particular shipper or discrimination among shippers is shown, there must be a nexus between the rebate and the amount of traffic. What is at issue here, of course, is not discrimination among shippers, but the granting, giving, or offering of rebates. As was said in *Chicago, St.P., M. & O. Ry. Co., supra:*

"The fact that defendant railway company treated all shippers of the same class of property for the same destination alike might be important and conclusive on a charge of discrimination; but, when the charge involved is granting a rebate or concession from a fixed tariff or rate in violation of a statute in clear terms making that particular act an offense, we are unable to appreciate the pertinency of evidence disclosing no violation of another and different provision of the interstate commerce law." 162 F. at 839.

Or, as more recently stated by the Supreme Court in *United States v. Braverman,* 373 U.S. 405, 407, 83 S.Ct. 1370, 1372, 10 L.Ed.2d 444 (1963):

"A Committee of the House of Representatives, in hearings on several bills proposing amendments to the Interstate Commerce Act, was told by the Chairman of the Interstate Commerce Commission that the existing law was '[i]n some important respects . . . practically unworkable.' In particular, he reported the virtual impossibility of showing that a rebate had resulted in an 'actual discrimination' among shippers and agreed with a member of the Committee that 'any departure' from the published rates should be made an offense. In its favorable report on the bill which became the Elkins Act, the Committee observed that it was 'practically impossible to show the discrimination' and recommended passage of its proposal making it 'a penal offense to make any departure from the published rates whether there be a discrimination or not.'"

Defendant's argument that there must be some relationship between the amount of the rebate and the traffic tendered would return the ICC to the regulatory nightmare the present statute was designed to end. So long as any rebate is given which results in the prohibited effect, then § 322(c) is applicable.

■ The sole issue remaining, therefore, is whether defendant "knowingly" gave the rebate in question. Defendant argues that criminal intent must be shown. The cases defining "knowingly" under § 322(c) are rare. However, many cases have defined "knowingly" under the nearly identical Elkins Act, 49 U.S.C. § 41, which prohibits the granting, giving, soliciting, accepting, or receiving of rebates by railroads. The Court in *Union Petroleum Corp. v. United States*, 376 F.2d 569 (10th Cir. 1967), citing *Armour Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908) stated:

"Furthermore, the term 'knowingly' imports merely perception of the facts necessary to bring the questioned activity within the prohibition of the statute." Id. at 573.

There is no evidence the Derby trip was a mistake or the result of negligence on the part of defendant's employees. It is not a defense that defendant, by its action, did not intend to give a rebate. The government need show only that the defendant intended to do the act which had the prohibited result. This the government proved beyond a reasonable doubt.

I, therefore, find the defendant guilty of all twenty-eight Counts of the Information.

## APPENDIX A

### OPINION

Defendant Key Line Freight, Inc. has been charged in a 28-Count Information with giving rebates to shippers in violation of 49 U.S.C. Section 322(c) which provides:

"Any person, whether carrier, shipper, consignee, or broker, or any officer, employee, agent, or representative thereof, who shall knowingly offer, grant, or give, or solicit, accept, or receive any rebate . . . or by any other means or device, shall knowingly and willfully assist, suffer or permit any person or persons, natural or artificial, to obtain transportation of passengers or property subject to this part for less than the applicable rate, fare, or charge . . . shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than $200 nor more than $500 for the first offense . . . ."

The information alleges in each count that the defendant carrier furnished an employee of a particular shipper an expense-paid trip to the Kentucky Derby on May 6, 1972. The alleged rebate, being the value of the expense-paid trip, varied in each count from $148.90 to $448.60. Each count alleges that these amounts were rebates on a particular shipment made at some time after May 6, 1972. The scheduled tariff charge for each of said shipments is set forth in each count and varies in amount from $8.65 to $419.47.

Count One is fairly representative of the 28 counts:

"On or about May 6, 1972, in the Western District of Michigan Key Line Freight, Inc., defendant, a motor carrier

of property subject to Part II of the Interstate Commerce Act (Title 49, Chapter 8, U.S.Code) did, in violation of 49 U.S.Code 322(c), knowingly and unlawfully offer, grant and give a rebate to Spee-Dee Check Out Systems, Inc., a shipper, in, that said defendant furnished George J. Glupker, Jr., an employee of said shipper, with a valuable consideration in the amount of $148.90 through the device of an expense paid trip to the Kentucky Derby. This constitutes a rebate and offset against the lawful freight charge of $232.73 specified in the tariff of the defendant on file with the Interstate Commerce Commission. This freight charge was collected by the defendant from SpeeDee Check Out Systems, Inc., on or about May 18, 1972, for the transportation of crates counters N.O.I. performed by the defendant on or about May 18, 1972, by motor vehicle over the public highways from Grand Rapids, Michigan, to Bellvue, Nebraska."

The defendant's motion to dismiss the information is based upon the following grounds: (1) that the allegations do not constitute a violation of the statute since bare and unrelated entertainment without a causal connection to tariff charges or traffic tendered does not amount to a rebate, (2) that the constitutional rights of the defendant are violated in that the information requires a broadening of the term "rebate" which is improper, and (3) that the statute and administrative interpretations are vague and fail constitutionally.

Both the government and the defendant have made reference to prior Interstate Commerce Commission rulings and particular reference is made to the Commission's "Administrative Interpretations—Statement of Policy" 49 C.F.R. 1004.2 which under paragraph (f)(3) provides:

> "Gifts of services or articles of substantial value to particular shippers or their representatives are considered violations of the law. For example, transportation of shipper representatives in carrier-owned aircraft or automobiles to resorts for recreational weekends or similar excursions are so regarded   .   .   .   ."

The briefs submitted on both sides have resolved that this statement of policy represents the Commission's interpretation that a particular form of conduct is in violation of the statute. At most, the interpretation gives notice to carriers and shippers that the Commission considers certain acts unlawful and will take enforcement action as deemed appropriate. It is clear that the information charges violation of 49 U.S.C. § 322(c) without reference to administrative rulings or regulations. For the purposes of this motion and the construction of 49 U.S.C. § 322(c), the primary authority remains the substantive case law.

In the area of rebates there are few cases to look to with regard to Section 322(c). However, a similar statute has been enacted under 49 U.S.C. § 41 dealing with the regulation of railroads. This act is commonly referred to as the Elkins Act. The cases interpreting rebates are more abundant with respect to the Elkins Act and are relied on by both sides in their briefs.

## I.

## WHETHER THE INFORMATION SUFFICIENTLY ALLEGES AN OFFENSE UNDER 49 U.S.C. SECTION 322(c)

The defendant contends that the information is insufficient in that it alleges bare and unrelated entertainment without an alleged causal connection to tariff charges or traffic tendered. The defendant maintains that in every case dealing with a rebate, there has been a connection between the unlawful device and the movement of traffic and the charges therefor. The defendant ,argues that when there is no direct benefit to the shipper, there must be an alleged causal relation between the act and tariff charge or the subsequent movement of traffic.

No case can be found which speaks directly to this issue. Besides the obvious situation where a carrier makes a cash payment back to the shipper, courts have determined such things as loans at insufficient interest, services such as warehousing at a

reduced cost, extension of credit, and commissions as rebate devices and unlawful under the statutes.

The Supreme Court in *United States v. Braverman*, 373 U.S. 405, 83 S.Ct. 1370, 10 L.Ed.2d 444 (1963), held that the rebate need not be for the benefit of the shipper. In that case, the defendant was the transportation manager of a shipper who was charged with unlawfully soliciting rebates from a freight forwarder. The indictment had been dismissed at the trial court for failure to allege that the rebate was for the benefit of the shipper. The Court reversed holding that the Elkins Act outlaws solicitations of rebates by any person whatever, no matter for whose benefit the rebate is sought. The Court further stated that Congress intended to prevent any kind of departure from the published rates and that to that end it outlawed all rebates.

The cases hold that the Elkins Act was to prevent any and all means that might be resorted to to obtain or receive concessions and rebates from the published tariffs. *Armour Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1907); *Vandalia R. Co. v. United States*, 226 F. 713 (6th Cir. 1915); *Northern Central Ry. Co. v. United States*, 241 F. 25 (2nd Cir. 1917).

The Court in *Armour Packing Co. v. United States*, 209 U.S. 56, 72, 28 S.Ct. 428, 431–432, 52 L.Ed. 681, stated:

"The all-embracing prohibition against either directly or indirectly charging less than the published rates shows that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about. If the public purpose which the statute was intended to accomplish be borne in mind, its meaning becomes, if possible, clearer.

"The Elkins act proceeded upon broad lines and was evidently intended to effectuate the purpose of Congress to require that all shippers should be treated alike, and that the only rate charged to any shipper for the same service, under the same conditions, should be the one established, published, and posted as required

by law. It is not so much the particular form by which or the motive for which this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates, duly posted and published."

It is clear, therefore, that since any device which results in the intended prohibition is an unlawful rebate, an expense-paid trip to the Kentucky Derby for shipper employees can be unlawful if the result is the prohibited deviation from the published tariffs.

The issue therefore concerns whether or not the information alleges sufficient facts. The elements of the offense are (1) the granting or giving of a rebate (2) from the published and filed rates (3) for the transportation of property (4) by a carrier engaged in interstate commerce. *Chicago, St.P., M. & O. Ry. Co. v. United States*, 162 F. 835, 838 (8th Cir. 1908).

An indictment which distinctly and clearly charges each and every element of the offense intended to be charged and distinctly advises the defendant of what he is to meet at trial is sufficient. *Armour Packing Co. v. United States*, supra, 209 U.S. at 84, 28 S.Ct. 428. *Chicago, St.P., M. & O. Ry. Co. v. United States*, supra, at 838.

The information in this case, in addition to setting forth the alleged time, place of shipments, tariff charge, the shipper, and carrier, alleges that the defendant did knowingly and unlawfully offer, grant and give a rebate by furnishing the shipper's employee a valuable consideration through the device of an expense-paid trip to the Kentucky Derby.

The trier of fact must (1) find facts to be true as charged in the information, (2) believe the effect of what was done was to have the goods in question transported at a lesser rate than named in the tariffs, and (3) that the defendant did the act knowingly and intentionally and knew that it was departing from the rate, and that the effect of what it was doing was to diminish the

cost of transportation and that it intended to do so. *Chicago St. P. M. & O. Ry. v. United States*, supra, at 843.

The cases do not support the position that the government must necessarily allege facts of any more particularity than those set forth in the information. The Supreme Court in the Armour Packing Co. case makes reference to *Ledbetter v. United States*, 170 U.S. 606, 18 S.Ct. 774, 42 L.Ed. 1162 (1897). The Court there at page 612, 18 S.Ct. at page 776 stated:

"Notwithstanding the cases above cited from our Reports, the general rule still holds good that upon an indictment for a statutory offense the offense may be described in the words of the statute, and it is for the defendant to show that greater particularity is required by reason of the omission from the statute of some element of the offense. Where the statute completely covers the offense, the indictment need not be made complete by specifying particulars elsewhere obtained."

This principle has been upheld in a long line of cases. More recently in *Hamling v. United States*, 418 U.S. 87, 117, 119, 94 S.Ct. 2887, 2907, 2908, 41 L.Ed.2d 590, 620, 621 (1974), an obscenity case, the Supreme Court held that it was generally sufficient to set forth the offense in the words of the statute as long as the indictment includes a statement of the facts and circumstances as will inform the accused of the specific offense. The Court there held that the legal definition of obscenity did not change with each indictment and that it was a term sufficiently definite in legal meaning to give the defendant notice of the charge against him.

Here the defendant is charged with knowingly and unlawfully giving a rebate to a shipper by the device of an expense-paid trip to the Kentucky Derby. The information contains the elements of the offense, informs the defendant of the charge against which it must defend, and further enables the defendant to plead an acquittal or conviction as a bar to further prosecution. These are the requirements as to the sufficiency of an information or indictment.

*Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1931). *United States v. Debrow*, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953).

II.

CAN CONSTITUTIONAL ARGUMENTS BE RAISED ON THE BASIS THAT THE PROSECUTION IN THIS INSTANCE REQUIRES A BROADENING OF THE TERM "REBATE" OR IN THE ALTERNATIVE, IS THE STATUTE UNCONSTITUTIONALLY VAGUE AND INDEFINITE?

Defendant contends that the prosecution in this instance amounts to a broadening of the term rebate and that such an interpretation should first be tested by civil action. The defendant also contends that the statute is unconstitutionally vague and indefinite. Essentially, these issues involve the question of notice.

A criminal statute must be sufficiently definite to give notice of the required conduct. However, most statutes must deal with untold and unforeseen variations in factual situations. No more than a reasonable degree of certainty can be demanded. *Boyce Motor Lines v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1951).

Where the offense is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of the law. *Screws v. United States*, 325 U.S. 91, 102, 65 S.Ct. 1031, 89 L.Ed. 1495 (1944).

Under the rule requiring that the law give fair notice of the offending conduct, regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed. See *Papachistou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

The Supreme Court in *United States v. National Dairy Products Corp.*, 372 U.S. 29, 36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) has

also distinguished cases involving the First Amendment where vagueness of the statute "on its face" may itself deter a constitutionally protected conduct. In that case, the statute was directed at conduct designed to destroy competition. There being no First Amendment issue, the Court considered the warning in terms of the statute "on its face" and also in light of the conduct to which it is applied.

In *Boyce Motor Lines v. United States,* supra, the court held that it was not unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line. The Court reasoned that the statute only punished those who knowingly violated the regulation in question and thus, the element of culpable intent did much to destroy the argument that the regulation was so unfair that it must be held invalid. See also *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1946) where the Court ruled that although there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls, this is not a sufficient reason to hold the language too ambiguous to define a criminal offense.

The cases hold that the purpose of Congress was to establish uniform rates for transportation and to give all the same opportunities to know what the rates are, as well as the equal benefit of them. In the opinion by Justice Harlan in *Louisville & N. R. Co. v. Mottley,* 219 U.S. 467, 477, 31 S.Ct. 265, 268, 55 L.Ed. 297 (1910), it is stated that:

> "The statute manifestly means that the purchase of a transportation ticket by a passenger, and its sale by the company, shall be consummated only by the former paying cash and by the latter receiving cash of the amount specified in the published tariffs."

At page 476, 31 S.Ct. at page 268, Justice Harlan can be further quoted:

> "But an examination of the schedules would be of no avail and would not ordinarily be of any practical value if the published rates could be disregarded in special or particular cases by the acceptance of property of various kinds, and of such value as the parties immediately concerned chose to put upon it, in place of money for the services performed by the carrier."

In order to effectuate the purpose of Congress, it is necessary that the transaction between shipper and carrier shall, in its totality, involve the paying of the scheduled tariff by the shipper in return for the transportation provided. Any other unscheduled inducement, gift, or concession, in whatever form, between carrier and shipper, if not unlawful, will be perilously close to crossing the line of proscribed conduct.

The defendant contends also that the government should first proceed by civil enforcement in this matter. There is little or no support for this position in either the statute or the cases involving rebates. Section 322(b)(1) provides for enforcement by injunction and Section 322(b)(2) provides a remedy for injured persons. By proceeding in a criminal action under Section 322(c), the government has increased its burden. It must prove beyond a reasonable doubt the allegations made including the necessary element of criminal intent.

The defendant refers to *United States v. Critzer,* 74–2 USRC P. 9505 (4th Cir. 1974), a tax case, where the court ruled that where the government by criminal prosecution was attempting to expand or alter a past given judicial interpretation, the appropriate vehicle was a civil action and not prosecution which intended potential loss of freedom. The potential loss of freedom does not exist in this instance. Furthermore, this court need not expand or alter a past given judicial interpretation. In fact, the court may rely on a judicial interpretation dating back to the turn of the century.

The cases above cited are consistent in holding that any and all devices can come within the statutory prohibition. The ultimate issue is the effect of the alleged device and not whether the particular conduct or device comes within any given, restricted, or enumerated list of acts. In this

sense, Congress and the courts have consciously anticipated the many unforeseen variations and situations which may arise.

The United States Court of Appeals for the Fifth Circuit in *United States v. Mann*, 517 F.2d 259 (1975), recently held that neither the absence of earlier prosecutions nor the failure of the appropriate government regulatory agency to provide guidelines constitutes the sort of "active misleading" by the government that bars a prosecution under the rationale of *Raley v. Ohio*, 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959), and *United States v. Laub*, 385 U.S. 475, 87 S.Ct. 574, 17 L.Ed.2d 526 (1966). That case dealt with a novel indictment charging a bank president with conspiring to misapply funds. In this case, in view of the Interstate Commerce Commission's Administrative Interpretations—Statement of Policy, there is no active misleading by the government. On the contrary, the defendant was on notice of the Commission's intent to prosecute this type of conduct.

The motion to dismiss the information is denied.

Dated: October 8, 1975.

### APPENDIX B

### STIPULATION

Now comes KEY LINE FREIGHT, INC., by its attorney, Robert A. Sullivan, and UNITED STATES OF AMERICA, by Frank S. Spies, United States Attorney for the Western District of Michigan, and Robert C. Greene, Assistant United States Attorney, and stipulate that the Court may accept the following facts as proven:

### LAW

The statutes and regulations applicable to this proceeding are 49 U.S.C. Section 322(c) and Section 1004.2(f)(2) and (3) of the Code of Federal Regulations which state as follows:

49 U.S.C. Section 322(c):

Any person, whether carrier, shipper, consignee or broker, or any officer, employee, agent, or representative thereof, who shall knowingly offer, grant, or give, or solicit, accept, or receive any rebate, concession, or discrimination, . . . or by any other means or device, shall knowingly and wilfully assist, suffer or permit any person or persons, natural or artificial, to obtain transportation of passengers or property subject to this part for less than the applicable rate, fare or charge, or who shall knowingly and wilfully by any such means or otherwise fraudulently seek to evade or defeat regulation as in this part provided for motor carriers or brokers, shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than $200 nor more than $500 for the first offense . . .

Section 1004.2(f)(2) and (3), Title 49, Code of Federal Regulations:

(2) No common carrier shall refund or remit in any manner or by any device, directly or indirectly, or extend to any person all privileges or facilities for transportation in interstate commerce except such as are specified in its tariffs. (Obviously no carrier's tariffs can contain provisions for gifts or privileges for preferenced customers, or any other limited class, since they are in violation of the law.)

(3) Gifts of services or articles of substantial value to particular shippers or their representatives are considered violations of the law. For example, transportation of shipper representatives in carrier-owned aircraft or automobiles to resorts for recreational weekends or similar excursions are so regarded. Also the use of trading stamps by common carriers is considered to amount to a rebate, whether the stamps are redeemable by the carrier or by a third party. Essentially, this is a discount and, though no cash is refunded, the equivalent of cash is given to the customer. Common carriers may not participate in such plans.

### FACTS

Key Line Freight, Inc. (hereinafter Key Line), is a Michigan corporation organized

in October 1, 1946. Key Line was originally incorporated under the name Darling Freight, Inc. On February 3, 1971, the name of this corporation was changed to Key Line Freight, Inc.

During all relevant periods, Key Line Freight, Inc., has been a common motor carrier of property conducting operations in the states of Michigan, Illinois, Indiana, Iowa, Kentucky, Minnesota, Missouri, Nebraska and Wisconsin under authority issued by the Interstate Commerce Commission in Docket No. MC–46280 and related Subs thereunder. This authority permits Key Line to transport commodities principally between Michigan points and points in Indiana, Illinois, Wisconsin and Eastern Iowa. The principal area in the State of Kentucky that Key Line is authorized to serve is that area immediately surrounding Louisville. In 1972 Key Line's gross revenues from interstate transportation of property for hire was approximately $22,000,-000.00.

Wallace-Blakeslee, Inc. arranged for a chartered plane to fly the participants to and from Louisville, Kentucky, and made arrangements for admission tickets, brunch, dinner and local Louisville transportation. Wallace-Blakeslee, Inc., a Grand Rapids, Michigan, advertising firm, was hired by Key Line to make "tour" arrangements for the trip. Wallace-Blakeslee, Inc., billed Key Line: (1) in the amount of $2,860.29 for the charter of the North Central Airline plane which was used to transport participants in the above-mentioned trip to the Kentucky Derby to and from Louisville, Kentucky; (2) $1,645.51 for preliminary work, mailings, box lunches, refreshments and complete supervision of the aforementioned Kentucky Derby trip; Key Line paid these charges by Check No. PO68903 in the amount of $2,860.29. Additional expenses of the Kentucky Derby trip in question paid for by Key Line were: (1) $428.00 for insurance for the tour group; (2) $154.92 for eleven single rooms in Grand Rapids, Mich., nine of which were for employees of customers utilizing the services of Key Line to transport freight in interstate commerce for hire; (3) $145.00 for bus transportation in connection with transportation to and from the Kentucky Derby; (4) $78.52 for *Key Notes*, a Key Line promotional brochure which was specially prepared for this trip and included the itinerary for the day and is attached as Exhibit 1; and (5) $1,616.73 for race track, attendance tickets, racing forms, programs and miscellaneous items. The cost to Key Line per individual who went on the Kentucky Derby trip was in excess of $100.00 but not more than $162.00.

All individuals named in the information in this proceeding were aboard the airplane chartered and paid for by Key Line to transport these individuals to the Kentucky Derby. The following is a list of the individuals named in the information who went on the trip furnished by Key Line (Column A), their employers (Column B), and the jobs they held on May 6, 1972 (Column C).

| A | B | C |
|---|---|---|
| George J. Glupker, Jr. | Speedee Check Out Systems | Vice President |
| Melvin A. Suokas | Chrysler Corp. | Supervisor–Rate Cost Control (Traffic Dept.) |
| George Hatfield | Chrysler Corp. | Supervisor– Routing Control (Traffic Dept.) |
| John J. Vankerschaver | Chrysler Corp. | Division Traffic Manager |
| Jack Hays | Hancock Industries, Inc. | Supervisor & Sales Coordinator |

| A | B | C |
|---|---|---|
| John Hulbert | Scott Paper Co. | Traffic Manager |
| Henry R. Kantor | Rockwell Standard Company | Traffic Manager |
| Robert A. Kenel | Sugar Beet Products Company | Shipping Clerk |
| Jack D. Ball | Manistee Iron Works | Shipping Supervisor |
| Arnold C. Begeman | Firestone Steel Products | Traffic Manager |
| Donald De Glopper | S. D. Warren Co. | Traffic Manager |
| Thomas Gibson | Magna Lock Corp. | Office Manager |
| Ike Green | Bendix Corp. | Traffic Manager |
| Clare J. Kurtz | Fuller Transmission | Mgr. Scheduling |
| Peter Manley | Continental Motors | Asst. Production Control Mgr. |
| William Mathews | Lobdell-Emery Mfg. Co. | Traffic Manager |
| Alvin M. Paull | Rapistan, Inc. | Traffic Manager |
| Tom Mieras | Rapistan, Inc. | Asst. Traffic Mgr. |
| Robert E. Miner | Kelsey Hayes Company | Shipping/Traffic Supervisor |
| Jerry North | Barsteel Corporation | Shipping/Receiving Dispatcher |
| Arthur Ortman | A. T. Ferrell & Co. | Shipping Clerk |
| Benjamin Post | Guardsman Chemical Coatings, Inc. | Traffic Manager |
| Emil Rasch | Westran Corporation | Production Mgr. |
| Paul Russell | Michigan Chemical Corporation | Traffic Manager |
| Robert Rymar | Knape & Vogt Mfg. Co. | Traffic Manager |
| Harry Sajecki | Budd & Company | Traffic Manager |
| Gailen Schell | Formsprag Co. | Traffic Manager |
| Robert Sibley | Bennett Pump | Traffic Manager |
| Robert E. Smith | Glidden Durkee | Distribution Mgr. |
| Gary A. Staats | Paragon Steel Co. | Asst. Vice-Pres. Plant Operations |
| Joe Windberg | Challenge Machine Corporation | Traffic Manager |

On May 5, 1972, all of the above-named individuals either determined which carrier would transport their employer's freight, or were in a position to influence that determination. Key Line did not condition the trip on the handling of any freight. Furthermore, that prior and/or subsequent to May 6, 1972, Key Line engaged in the transportation of commodities subject to Interstate Commerce Commission for each of the above-named individuals. None of the individuals attending the Kentucky Derby visited the Key Line Terminal at Louisville, Kentucky. However, Mr. Fritz Hoffman, Manager of the Louisville Terminal, attended the Kentucky Derby, met the plane and hosted the group. In addition to these,

other individuals, not employed by companies which tendered freight to Key Line for transportation, went on the trip furnished by Key Line:

| A | B | C |
|---|---|---|
| Edward Barnes | Michigan National Bank | Executive Vice-President |
| Joseph Hinton | Road Equipment, Inc. | President |
| Harold Phelps | Michigan Nat'l Bank | Vice-President |
| Robert Van Zanten | Michigan Nat'l Bank | Vice-President Commercial Loans |
| Daniel Wallace | Wallace-Blakeslee | Secretary-Treasurer |
| Keith Weldy | Wallace-Blakeslee | Accountant Executive |

In addition, the following Key Line employees, directly or indirectly related to its Sales Department, went on this trip:

| A | B | C |
|---|---|---|
| James Carrol | Key Line Freight | Sales Manager Detroit Area |
| Daniel Darling | Key Line Freight | Chairman of Board |
| John Darling | Key Line Freight | Vice-President |
| Frank Davis | Key Line Freight | Sales Manager Outstate Michigan |
| Ron DeVries | Key Line Freight | Salesman Muskegon |
| William Gilbert | Key Line Freight | Comptroller |
| Paul Jolley | Key Line Freight | Vice-President Sales Steel Division |
| Aelan Lowe | Key Line Freight | Salesman Muskegon |
| Jon Rauch | Key Line Freight | Director of Sales |
| Eugene Richards | Key Line Freight | Salesman Grand Rapids |

Key Line admits transporting the shipments referred to in the information in this matter and further admits that each shipment consisted of commodities moving in interstate commerce and subject to regulation pursuant to the Interstate Commerce Act. These shipments, as well as other shipments for these shipping companies, were transported by Key Line and billed by Key Line and paid by the shipper at the rate contained in the appropriate tariff. The tariff filed with the Interstate Commerce Commission setting forth specific charges for this transportation set forth the charges specified in the information.

From 1968 through 1973, Key Line subscribed to the Federal Register, in which was published on July 24, 1969, what is now Section 1004.2(f)(2) and (3).

FRANK S. SPIES
United States Attorney

By /s/ ROBERT C. GREENE
Assistant United States Attorney

KEY LINE FREIGHT, INC.

By /s/ ROBERT A. SULLIVAN
Its Attorney

Dated October 19, 1976

EXHIBIT A

# KEY NOTES

**SPECIAL EDITION**

KEY LINE FREIGHT

OF THE ROAD · KINGS · KEY LINE

# DERBY DAY!

*98th*

*"Run for the Roses"*

Saturday, May 6, 1972

Churchill Downs

## NORTH CENTRAL JET PROP FLIGHT 5126

### Grand Rapids - Louisville

### Saturday, May 6, 1972

### Kent County Airport - Grand Rapids, Mich.

8-8:15 a.m. — Meet in Lobby; Registration

8:30 a.m. — Board Plane

8:45 a.m. — Depart for Louisville
Continental Breakfast on Board

10:00 a.m. — Arrive Louisville

10:15 a.m. — Board Chartered Bus for
Churchill Downs

10:45 a.m. — Arrive at Track

11:30 a.m. — Post Time
Enjoy the Race (see opposite page)

7:30 p.m. — Bus Leaves for Airport

8:30 p.m. — Plane departs for Grand Rapids
Kentucky Style Dinner and
Cocktails served on board

9:45 p.m. — Arrive Grand Rapids

# At the Derby with Fritz

*by Fritz Hoffman*

A few items to keep in mind while attending the Kentucky Derby are: a) It's called the most exciting two minutes in sports, b) It's also the place where the pickpockets of America hold their mythical annual convention . . . so hold on to your Mint Julep.

Two dollars is the minimum wager. When purchasing your pari-mutual tickets, give the horses number FIRST and then the number of tickets desired. Example, number 4 . . . three tickets. Also try to have the correct amount when buying and if not, always count your change.

Never discard losing tickets after a race until the OFFICIAL sign lights up on the tote board. There are instructions listed in the Racing Program on how to purchase and cash tickets plus other pertinent information. It would be a good idea to read these instructions before having your first Mint Julep.

If you have binoculars, bring them along as they will add to your enjoyment. (Though betting on people is prohibited, watching the "fillies" can be equally as entertaining.) It never rains on Derby Day (except in 1948 and 1967), but it may be wise to bring a rain coat.

### OTHER BITS OF MEMORABILIA

Now a few words of wisdom from the Old Pro to the Novice. If this is your first visit to a race track . . . forget the racing form . . . ignore touts . . . pay attention to no one. Play names, numbers or hunches. There's nothing like beginners luck.

Favorites win 33% of all races. There are nine races today, three winning favorites, right? Wrong! None today, 6 out of 9 tomorrow and there goes the system. Playing the favorite in each race will result in a slow, but sure, death . . . but the Mint Juleps WILL deaden the pain. Long-shots are a great feeling when you hit, but they don't very often. Like I said, get a hunch and bet a bunch.

Estimated attendance will be 100,000 . . . all claiming to be experts. A fellow at the track with manure on his shoes does not qualify as an expert. It may only indicate that he doesn't watch where he walks.

Finally, as the horses parade to the post for the 98th Run for the Roses and the band plays "My Old Kentucky Home" and you sip your last Julep, it's considered good form to shed a tear or two.

After the race, you will find many grown people weeping and sobbing openly, but it has nothing to do with "My Old Kentucky Home." They are thinking of Monday, May 8th, which in Luvulle is known as co-signers day!

Fritz

*ABOUT OUR KEY LINE "HANDICAPPER"*

*In addition to being the Key Lines' Louisville Terminal Manager, "Fritz" acquired his Masters in Handicapping at Churchill Downs and did post-grad work at Miles Park, Hialeah and Arlington Park. A very expensive Education it was indeed. Enroute to the track he will pass along to u-all his Key selection of the day.*

FRITZ HOFFMAN